IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| PAUL EZRA RHOADES, | ) | |
| | ) | Case No. CV 93-0156-S-EJL |
| Petitioner, | ) | (Bonneville County) |
| | ) | |
| v. | ) | **CAPITAL CASE** |
| | ) | |
| A.J. ARAVE, Warden, | ) | **MEMORANDUM DECISION** |
| | ) | **AND ORDER** |
| Respondent. | ) | |
| _____ | ) | |

  Paul Ezra Rhoades has been convicted of murder, and other associated felonies, for

the shooting deaths of Stacy Baldwin, Susan Michelbacher, and Nolan Haddon, all of which

occurred in eastern Idaho during an approximately three week period in February and March

of 1987. After separate jury trials, Petitioner was sentenced to death in both the

Michelbacher and Baldwin cases. Petitioner entered a conditional guilty plea in the Haddon

case, and he received two indeterminate life sentences. The present habeas case arises from

the state court's judgment in the Michelbacher matter.

  The Court previously dismissed several claims as procedurally defaulted. (Docket No.

95.) Currently at issue are the merits of the following claims in the Second Amended

Petition: 1-5, 7-10, 12, 14, 17, and 18.[1] After considering the pleadings, briefing, and

_____

   [1] Petitioner has briefed Claim 15 on the merits, but that claim has previously been
dismissed.  (Docket No. 95, p. 14.)

**Memorandum Decision and Order - 1**

record, the Court concludes that Petitioner is not entitled to relief.  The Court further concludes that an evidentiary hearing will not be conducted on any remaining claims of ineffective assistance of counsel.  Accordingly, the Petition shall be denied and this cause of action shall be dismissed.

## I.

## FACTUAL BACKGROUND

Early in the morning of March 19, 1987, Susan Michelbacher was feeling ill and decided to take the day off from her job as a special education teacher in Idaho Falls.  She left home around 6:30 a.m., telling her husband that she intended to drop off her lesson plans at school and then return home to rest.

Around 7:30 a.m., Valerie Stapf was looking for a place to park in a grocery store parking lot when she nearly collided head-on with a large, amber-colored van very similar to the one Michelbacher was driving that morning.  Two people were sitting in the front seat.  Stapf was never able to identify the driver, other than to note that it was a young woman who was similar in appearance to Susan Michelbacher, but Stapf would later testify that the passenger – whom she described as having long dark hair and being "real big, real kind of rough and dirty looking"– was Paul Rhoades, the Petitioner in this case.  The female driver and Petitioner appeared to be agitated, and after a short stand-off, the van backed up and drove toward a bank at the far end of the parking lot.

As soon as the bank opened, the van pulled up to the drive-in window.  The teller recognized Michelbacher, who presented her with a check already made out for $1,000, which the teller cashed.  Within a matter of minutes, Michelbacher arrived at a different drive-in branch of the same bank and again cashed a check for $1,000.

That same day, Susan Browning was preparing to leave her residence in a rural area west of Idaho Falls when she observed this same amber-colored van come to a stop on the shoulder of the highway, blocking her driveway.  Browning claimed to see three people in the van, one of whom she later positively identified as Petitioner.  She would also identify the other two individuals as Harry Burke, Petitioner's cousin, and Teresa Rhoades, Petitioner's sister, but she did not see anyone who matched Susan Michelbacher's description.  After a few minutes, the van drove away.  Two other witnesses would come forward and claim to have seen Petitioner, or someone matching his appearance, either driving or riding in the Michelbacher van.

The van was discovered the next day in the same grocery store parking lot in which Valerie Stapf saw it the day before, but with an additional 150 to 200 miles on the odometer and a scratched exterior.  Long brown hair consistent with Petitioner's hair was discovered inside.

On March 21, Michelbacher's body was found in a remote area west of Idaho Falls. She had been raped, shot nine times, and her assailant had also ejaculated in her mouth, either as she was lingering near death or after she had already died.  According to a State's serological expert, Petitioner could not be excluded as a source of the semen that was

**Memorandum Decision and Order - 3**

retrieved from the body, while Harry Burke and Michelbacher's husband could be excluded.

The next day, when Petitioner arrived at an acquaintance's house with a large amount of cash, he remarked that he had just "come into some money" and was on his way to Jackpot, Nevada to gamble.  A few hours later, he was spotted at a gas station between Idaho Falls and Jackpot, again with a roll of cash.  Also around this time, Petitioner's mother, Pauline Rhoades, reported to police that her green Ford LTD had been stolen.

On March 24, two truck drivers saw the Rhoades vehicle parked on a highway median in northern Nevada.  A person matching Petitioner's description hurriedly exited the car, fumbled with something brown in his hands, and then jogged off into the sagebrush.  A highway patrolman who responded to the accident scene found a .38 caliber handgun laying on the ground near the open door of the car, and ballistics testing would soon confirm that this weapon had fired the bullets that killed Michelbacher.

Idaho authorities were notified that Pauline Rhoades's car had been discovered, and officers proceeded to Nevada armed with a warrant for Petitioner's arrest for an unrelated burglary.  Once there, they processed the car for evidence and found, among other items, ammunition that matched the type used in the homicide.

The day after Petitioner abandoned his mother's car, Nevada law enforcement officers arrested him while he gambled at a casino in Wells.  Idaho officers Victor Rodriguez and Dennis Shaw arrived shortly thereafter, and as they approached, Petitioner blurted out, "I did it."  Upon hearing this, Rodriguez read Petitioner his *Miranda* warnings.  After Petitioner had been transported to a highway patrol substation for processing, Detective Shaw mentioned

**Memorandum Decision and Order - 4**

that if he had arrested Petitioner sooner, three murder victims might still be alive. Petitioner responded to this comment by again saying, "I did it."

The State ultimately charged Petitioner with murder in the first degree, kidnapping in the first degree, rape, robbery, and the infamous crime against nature. A jury found him guilty as charged, and the state court sentenced him to death for murder, death for kidnapping, and fixed life in prison for rape, robbery, and the infamous crime. The court enhanced the sentences by an additional fifteen years for the use of a firearm during the commission of the crimes.

## II.

## STATE AND FEDERAL PROCEDURAL BACKGROUND

In accordance with Idaho's special post-conviction procedure applicable to capital cases, Petitioner sought post-conviction relief before completing the direct appeal. The district court ultimately held an evidentiary hearing and denied relief. The Idaho Supreme Court consolidated the appeal from that decision with the direct appeal and affirmed in all respects. *State v. Rhoades*, 822 P.2d 960 (Idaho 1992).

Petitioner filed a Petition for Writ of Habeas Corpus in this Court in 1994, which he amended two years later, raising eighteen habeas claims. On March 21, 1997, this Court entered an order dismissing all or part of ten claims, including all claims of ineffective assistance of counsel. (Docket No. 95.) At the same time, the Court entered a separate order denying Petitioner's request for an evidentiary hearing. (Docket No. 94.) Subsequently, the Court permitted Petitioner to delete and replace his second claim, add a new factual

**Memorandum Decision and Order - 5**

allegation to his fourteenth claim, and add an entirely new claim based upon an alleged violation of Petitioner's Fifth and Sixth Amendment rights during the presentence investigation interview (now Claim 18). (Docket Nos. 174, 200.) These amendments are included within the Second Amended Petition, which was filed on September 27, 2001.[2] (Docket No. 175.)

While this case was pending, the Ninth Circuit Court of Appeals decided *Hoffman v. Arave*, 236 F.3d 523 (9th Cir. 2001). In that case, the Court of Appeals held that Idaho's forty-two day time limitation for bringing all post-conviction claims, coupled with the state court's failure to appoint new counsel during that time, frustrated the petitioner's right to raise claims of ineffective assistance of counsel in state court. *Id*. at 535. The Court of Appeals determined that the procedural default of such claims under those circumstances would be excused. In light of *Hoffman*, this Court reconsidered its earlier decision to dismiss Petitioner's claims of ineffective assistance of counsel, and the parties were allowed to submit supplemental briefing to separate triable issues from issues that could be decided as a matter of law. (Docket No. 222.)

On May 18, 2006, the Court issued a Memorandum Decision and Order denying an evidentiary hearing on most allegations of ineffective assistance of counsel, but the Court reserved its decision in two limited areas. (Docket No. 246, p. 1.) The Court then ordered supplemental briefing on the merits of all non-dismissed habeas claims. The parties have

---

[2] The Court did not allow all of the amendments contained in the Second Amended Petition, but it did allow the substantive ones that will be addressed here.

**Memorandum Decision and Order - 6**

now submitted their supplemental briefing, and Petitioner has lodged numerous documents that he intends to comprise a factual proffer in support of his allegations of ineffective assistance of counsel.

The Court has considered the pleadings, the record, and the parties' briefing, and it is now prepared to rule.

### III.

### HABEAS STANDARDS

Because this case was initiated before the enactment of the Antiterrorism and Effective Death Penalty Act (AEDPA), it is not governed by AEDPA's provisions. *Lindh v. Murphy*, 521 U.S. 320, 327 (1997).

Under pre-AEDPA law, the Court must presume that the state court's findings of historical fact are correct and defer to those findings unless there is convincing evidence to the contrary or a lack of fair support in the record.  28 U.S.C. § 2254(d) (1994); *Mayfield v. Woodford*, 270 F.3d 915, 922 (9th Cir. 2001).  The Court exercises its independent judgment over questions of federal law and must resolve legal issues on the merits under ordinary rules.  *Summerlin v. Schriro*, 427 F.3d 623, 628-29 (9th Cir. 2005).

### IV.

### ANALYSIS OF CLAIMS

### Claim 1:  *Griffin* Error

For his first claim, Petitioner alleges that the prosecutor impermissibly commented on his choice not to testify in his own defense.  Petitioner contends that these comments

**Memorandum Decision and Order - 7**

violated his privilege against self-incrimination under the Fifth Amendment.  Petitioner is not entitled to relief on this claim.

    1.   <u>Facts</u>

On the day that she was killed, Susan Michelbacher was forced to cash two checks, for a total of $2,000.  Within a few days, Petitioner was seen with a substantial amount of cash, and he boasted to friends that he had just "come into some money."  In an apparent effort to explain this windfall, Petitioner's counsel presented two witnesses at trial who each testified that Petitioner was employed in the months before the Michelbacher homicide.  (Tr. Vol. VIII, pp. 2015-2024.)

While commenting on Petitioner's statement that he had "come into some money," the prosecutor made the following remarks:

> When I get paid, when you get paid is that how you describe it that you came into some money?  That's the phrase that you use when you inherit some money or come into some other windfall.  In today's world when money changes hands legitimately there's generally a document that documents that transaction.  A receipt, a check, a passbook saving's account that indicates that transfer of those funds.  *What did we hear from the defendant yesterday*?
>
> [DEFENSE COUNSEL]:   Excuse me, Your Honor –
>
> [PROSECUTOR]:        I'm sorry –
>
> [DEFENSE COUNSEL]:   I'm going to object.
>
> [PROSECUTOR]:        I'm sorry, *what did we hear from defense counsel in the case-in-chief yesterday*?  We heard the defendant's uncle take the stand and say, "Well I hired him on occasion to plow snow." [Defense counsel] asked him, "In January or February did you pay him?"  "Well, yeah that was a down year, I paid his father fifteen hundred dollars."  Not a word about what the defendant may or may not have received, not one word, and no

**Memorandum Decision and Order - 8**

sentence about the month of February.  The weekend of the 20th, 18th, 19th, 20th.  Not one word.

(Tr. Vol. VIII, pp. 2127-2028.) (Emphasis added.)

In addition to these comments, the prosecutor devoted a portion of his closing argument to asking the jury to consider that the defense had failed to explain, rebut, or contradict the evidence that incriminated Petitioner.

Petitioner contends that the prosecutor's statement, "what did we hear from the defendant yesterday," was an impermissible comment on his Fifth Amendment privilege not to testify.  He further argues that the prosecutor's more general remarks throughout his closing argument about the failure of the defense to explain or contradict the State's incriminating evidence also amounted to commentary on his silence.

Respondent counters that the prosecutor's isolated reference to "the defendant" was a slip of the tongue that was immediately corrected, and that his other statements were not improper.  Respondent contends that even if error occurred, it was harmless.  This Court agrees.

2.     Standard of Law

In *Griffin v. California*, 380 U.S. 609, 615 (1965), the United States Supreme Court held that the Fifth Amendment prohibits a prosecutor from asking a jury to infer a defendant's guilt based upon his decision not to testify.  Such commentary impermissibly burdens the defendant's exercise of his privilege against self-incrimination.  *Id*.  A

**Memorandum Decision and Order - 9**

constitutional violation only occurs, however, when a prosecutor's comment was "manifestly intended to call attention to the defendant's failure to testify, or is of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify." *Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987).  A prosecutor is generally free to argue that the "defense" or "defense counsel" failed to explain away incriminating facts, as long as the defendant is not the only witness who could have provided the missing testimony.  *Id.* at 810; *see also United States v. Aldaco*, 201 F.3d 979, 989 (7th Cir. 2000).  In other words, a "prosecutor may properly comment upon a defendant's failure to present witnesses so long as it is not phrased to call attention to defendant's own failure to testify." *United States v. Fleishman*, 684 F.2d 1329, 1343 (9th Cir. 1982); *United States v. Wasserteil*, 641 F.2d 704, 709-10 (9th Cir. 1981).

      3.    <u>Discussion</u>

Initially, this Court concludes that the prosecutor did not violate *Griffin* or its progeny when he argued that the certain incriminating evidence had not been rebutted, contradicted, or explained.  With the exception noted above, these comments were directed at the failure of "the defense" or "defense counsel" to provide a contrary explanation.  The prosecutor did not expressly or directly call attention to Petitioner's failure to testify, and Petitioner has not shown that in any of the instances only he could have provided the missing testimony.  Therefore, this line of argument would not have naturally and necessarily been taken by the jury as commentary on Petitioner's failure to testify, and his assertions to the contrary are not

**Memorandum Decision and Order - 10**

persuasive.[3]

This Court also concurs with the state trial court's finding that the prosecutor likely misspoke one time when he said, "what did we hear from the defendant yesterday." (Tr. Vol. VIII, p.2167.)  A slip of the tongue does not amount to an intent to call attention to Petitioner's decision to remain silent at trial.

More importantly, the jury had actually heard testimony from the defense on the precise point that the prosecutor was then discussing.  Defense counsel called witnesses during their case-in-chief precisely to show how Petitioner might have "come into some money," and the prosecutor's comment was embedded within a discussion about why that testimony was not persuasive.  As the Idaho Supreme Court recognized, it is not improper for a prosecutor to point out inconsistencies or weakness in the defendant's evidence. *Rhoades*, 822 P.2d at 968 (citations omitted).

It is for this reason that the present case is distinguishable from the primary case upon which Petitioner relies, *United States v. Sigal*, 572 F.2d 1320 (9th Cir. 1978).  In *Sigal*, the

---

[3] For instance, the prosecutor referred to the allegedly uncontradicted ballistics, hair, blood, and semen evidence.  (Tr. Vol. VIII, pp. 2117-2121.)  Contradictory test results or impeachment material would have most likely been presented through a defense expert.

Slightly more problematic is the prosecutor's query that "if there was any explanation . . . for the defendant's whereabouts during the time that this crime occurred, don't you think you would have heard it?"  (Tr. Vol. VIII, p. 2156.)  But it is not the case, as Petitioner suggests, that only he could have provided that explanation.  *See Petitioner's Reply to Respondent's Supplemental Brief*, p. 2. Such evidence certainly could have been produced through other witnesses who saw him somewhere else at the time that the crime was committed.

**Memorandum Decision and Order - 11**

defendants did not testify, and the prosecutor thereafter argued that "the defendants did not deny" that they were in charge of the alleged conspiracy. *Id*. at n.2.  On appeal, the Government contended that the prosecutor meant to say "defense attorneys" instead of "the defendants." *Id*. at 1322-23.  The Ninth Circuit noted that the Government's construction "appears to be both logical and consistent when viewed in hindsight," but it concluded that the statement "taken at its face value, as we must assume the jury took it, constituted a comment on the failure of the defendants to testify, and thus was error of constitutional dimension." *Id*. at 1323.  The Court ultimately found that error to be harmless. *Id*.

Unlike *Sigal*, the prosecutor in the present case immediately changed his statement in front of the jury from "defendant" to "defense counsel," which was consistent with his other statements throughout the closing argument.  Also unlike *Sigal*, at the time that the statement was made in this case, the prosecutor was discussing infirmities in the evidence that the defense had actually produced.  Taken at its "face value," then, the jury in this case would not have naturally understood the prosecutor's comment to relate to Petitioner's failure to testify.

To the extent that any error may have occurred, Petitioner has not carried his burden to show that it had a "substantial and injurious effect or influence on determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 626, 638 (1993); *Bains v. Cambra*, 204 F.3d 964, 977 (9th Cir. 2000).  When addressing *Griffin* claims in a habeas context, the Ninth Circuit has noted that prejudicial error will be found only when the impermissible comment is

**Memorandum Decision and Order - 12**

extensive, where an inference of guilt from silence is stressed to the jury as a basis for conviction, and where the evidence could have supported an acquittal. *Beardslee v. Woodford*, 358 F.3d 560, 587 (9th Cir. 2004).

The prosecutor's comment, "what did we hear from the defendant yesterday," if improper, was not extensive, and rather than stress to the jury that it should infer Petitioner's guilt because of his failure to testify, the prosecutor argued that Petitioner's evidence was not persuasive. As an added protection against prejudice, the trial court instructed the jury that a defendant need not testify and that the jury should draw no adverse inference from the defendant's decision not to take the witness stand. (R. Vol. II, p. 577.) Additionally, though the State's case was based on circumstantial evidence, it was quite strong, and Petitioner has not pointed to compelling evidence that could have supported an acquittal.

In an apparent effort to show prejudice, Petitioner relies on juror affidavits that were filed during the post-conviction proceeding in state court. This reliance is misplaced. Under Rule 606(b) of the Federal Rules of Evidence, juror testimony is admissible only as to (1) whether extraneous prejudicial information was improperly brought to the jury's attention, or (2) whether any outside influence was improperly brought to bear upon any juror. *United States v. Rutherford*, 371 F.3d 634, 640 (9th Cir. 2004). A court may not consider testimony about the subjective effect that extraneous contact or information may have had on a particular juror or on the decision-making process generally. *Sassounian v. Roe*, 230 F.3d 1097, 1108-09 (9th Cir. 2000). Therefore, if Petitioner intends for the jurors' affidavits to

**Memorandum Decision and Order - 13**

show the subjective effect that the prosecutor's statement had on their deliberations, this Court is barred from considering it.

At any rate, the affidavits would not help Petitioner.  Only three of the non-alternate jurors who agreed to be interviewed recalled the prosecutor's comment; one juror did not believe that it had "big influence," another claimed that it "wasn't much of a factor," and the third did not believe it had any impact.  (PCR Vol. I, pp. 203-31; Tr. Vol. I, pp. 170-71.)  Yet another juror indicated that he thought he remembered hearing the statement but was unsure. (PCR Vol. I, pp. 239-40.)  This is not the kind of compelling evidence upon which this Court could find that Petitioner was prejudiced.

Based on the foregoing, the first claim for relief will be denied.

## Claim 2:  Right to Jury Factfinding

 Petitioner next contends that his Sixth and Fourteenth Amendment rights were violated because a judge, rather than a jury, decided the additional facts that increased his maximum punishment from life to death.  This claim is based upon *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and, more particularly, *Ring v. Arizona*, 536 U.S. 584 (2002).  The Supreme Court has since determined that *Ring* announced a new rule of constitutional law that is not retroactive to cases that became final before it was decided.  *Schriro v. Summerlin*, 542 U.S. 348, 358 (2004).  Because Petitioner's convictions became final nearly eight years before *Apprendi* and ten years before *Ring*, this claim is clearly barred under *Summerlin*, and it will be dismissed on that basis.  *See Teague v. Lane*, 489 U.S. 288 (1989).

Memorandum Decision and Order - 14

Petitioner also alleges that he was deprived of due process and equal protection of the law because the Idaho state courts have not applied the jury trial right from Idaho's constitution to capital defendants.  The interpretation of a state constitution is solely a matter of state law, and Petitioner's attempt to transform this issue into a federal question is unavailing.  Thus, this aspect of the claim is not cognizable on federal habeas review.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

## Claim 3:  Alleged *Brady* Violations

Relying on *Brady v. Maryland*, 373 U.S. 83 (1963), Petitioner next asserts that his constitutional right to due process of law under the Fourteenth Amendment was violated when the prosecution withheld certain evidentiary items from the defense.  These items fall into two general categories:  (1) material related to an individual named Kevin Buchholz, who had made, and then retracted, incriminating statements about the murder of Stacy Baldwin in Bingham County; and (2) purported impeachment material related to State's trial witness Susan Browning.  The Court concludes that Petitioner has not shown a *Brady* violation.

1.    Standard of Law

It is well established that the prosecution has a duty under the due process clause of the Fourteenth Amendment to disclose exculpatory evidence to the defense that is material to guilt or punishment.  *Brady v. Maryland*, 373 U.S. 83 (1963); *United States v. Bagley*, 473

**Memorandum Decision and Order - 15**

U.S. 667, 676 (1985).  A meritorious *Brady* claim contains three essential components: (1) the evidence must be favorable to the accused, either because it is exculpatory or impeaching; (2) the prosecution must have withheld the evidence, either intentionally or inadvertently; and (3) the evidence must be material to guilt or punishment.  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).  Suppressed evidence is material, and its non-disclosure is prejudicial, when there is a reasonable probability that had the evidence been disclosed, the result of the trial would have been different.  *Bagley*, 473 U.S. at 682; *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995).

      2.    <u>Kevin Buchholz</u>

      (a)    <u>Background</u>

In the early morning hours of February 28, 1987, Stacy Baldwin was abducted from her job as a clerk at the Red Mini Barn convenience store, taken to a remote location, and shot several times, where she eventually bled to death.

Two weeks later, Kevin Buchholz was arrested on a drunk and disorderly charge.  As he was being transported to the county jail, Buchholz told the arresting officer, Joseph Love, "I don't care, I was the one who killed the girl at the Mini Barn, why don't you pin that on me–I did it."  (Exhibit D admitted at the Post-Conviction Relief Hearing, 1-11-1989.)[4]  Love prepared a written statement that included this information.

After he had been placed in a holding cell, Buchholz continued his tirade, informing

---

[4]  The exhibits admitted at the post-conviction hearing were part of the state court record on appeal and were lodged with this Court on May 24, 1995.

**Memorandum Decision and Order - 16**

Officer Larry Christian that he had shot the "girl from the Mini Barn" twice in the back, though he had fired at her several times with a .38 caliber or a nine millimeter handgun. (PCR Exhibit A.)  He also claimed to have stolen a green pickup, which he abandoned after committing the crime.  (PCR Exhibit A.)  Some of these details were roughly consistent with other evidence in the case.

Detective Paul Newbold was informed of Buchholz's comments to Officer Christian. Newbold told Officer Christian to prepare a written statement that included Buchholz's confession, which he did.  Detective Newbold also related the incident in his own police report:

> [A]ccording to Christian, Buchholz stated that he shot the girl at the Mini Barn twice in the back.  He also stated that he shot at her several times and hit her in the back twice.  Christian also stated that Buchholz further stated that he had stolen a green pickup from Pocatello and that the gun used was either a .38 or 9mm.  Larry Christian wrote a statement in regard to this.

(PCR Exhibit C.)  In his report, Newbold further indicated that Buchholz had recanted his statements, which he claimed had been made out of anger because he believed that Officer Love was "piling up charges."  Buchholz also provided the officers with an alibi.  (PCR Exhibit C.)  The police ultimately did not believe that Buchholz was a viable suspect in the Baldwin homicide.  Altogether, at least three police reports were generated in relation to this matter; one each by Love, Christian, and Newbold.

The State prosecuted separate murder cases against Petitioner in Bonneville and

Bingham Counties.  Before trial in the Bonneville County matters, Petitioner's attorneys requested all police reports pertaining to the Baldwin homicide in Bingham County.  As part of discovery, the State turned over Detective Newbold's report, which included the Buchholz "confession," but apparently did not disclose the two additional reports of Love and Christian.

The trial court in Bonneville County eventually ruled that the Michelbacher and Haddon charges would be tried separately.  The court also ruled, at Petitioner's request, that evidence related solely to the Baldwin homicide would not be introduced at the Michelbacher trial, and that each case would rise or fall on its own merits.  Buchholz was listed as a potential defense witness, but he was in California by the time of trial and did not testify.

When it became apparent during post-conviction proceedings that the additional police reports existed, and that Buchholz had taken and allegedly failed a polygraph examination, Petitioner claimed that the State had not complied with its duty to disclose exculpatory evidence.  During an evidentiary hearing, one of Petitioner's trial attorneys, Stephen Hart, testified that although Newbold's report had been disclosed, he had not seen the written statements from Love and Christian until after trial.  (PCR Tr. Vol. I, pp. 210, 213.)  Buchholz also testified at the hearing.  He admitted making some of the comments that had been attributed to him, but he denied others.  (PCR Tr. Vol. II, pp. 364-66.)  He reiterated that he fabricated the entire confession because he was simply intoxicated and angry at being arrested on what he perceived to be bogus charges.  (PCR Tr. Vol. II, pp. 365, 374-75.)

**Memorandum Decision and Order - 18**

The trial court denied relief, noting that Petitioner had vigorously opposed the admission of evidence from the Baldwin matter and that his new position was inconsistent with that previous stance.  The court also determined that the Buchholz confession would have been inadmissible because it was "irrelevant to the criminal proceedings in the Michelbacher matter."  (PCR R. Vol. I, pp. 268-69.)  On appeal, the Idaho Supreme Court affirmed, concluding that because the State had disclosed the Newbold report, the defense could have conducted additional inquiry into the matter had it chosen to do so.  *Rhoades*, 822 P.2d at 972.

> (b)    Discussion

Petitioner nearly stumbles out of the gate on the initial requirement that the evidence that was allegedly withheld must be exculpatory or favorable to him *in this case*.  *See Strickler*, 527 U.S. at 281-82.  Aside from the failed polygraph, the Buchholz material relates entirely to the Baldwin homicide, not the Michelbacher case.  Petitioner argues that the material is still exculpatory because ballistics tests tended to show that the same person – or at least bullets fired from the same handgun – killed both Baldwin and Michelbacher.  Thus, according to Petitioner, an alternate suspect in the Baldwin matter would have necessarily been an alternate suspect for the jury to consider at the Michelbacher trial.

Though the Court is skeptical of this argument, it need not ponder the matter for long, as Petitioner's claim fails because he has not shown that any of this allegedly withheld information would have been admissible at the Michelbacher trial, or that its disclosure could

**Memorandum Decision and Order - 19**

have at least led to the discovery of admissible evidence or impeachment material.  To the contrary, the state trial court had ruled that evidence that related solely to Baldwin matter would not be introduced at the Michelbacher trial, and the court later specifically found that Buchholz's purported confession to the Baldwin crimes would have been excluded as irrelevant.  (PCR R., p. 209.)  Likewise, absent a stipulation, polygraph results are inadmissible under Idaho law.  *State v. Fain*, 774 P.2d 254, 256-57 (Idaho 1989). Information that a jury would never hear cannot be material or prejudicial for *Brady* purposes because, by definition, there is no possibility of a different outcome.  *See United States v. Kennedy*, 890 F.2d 1056, 1059 (9th Cir. 1989) (citing *United States v. Ranney*, 719 F.2d 1183, 1190 (1st Cir.1983)).  Petitioner's suggestion that disclosure of the additional police reports and the polygraph result would have triggered a deeper investigation into Buchholz as a possible suspect is speculative.  Such speculation will not support a *Brady* claim.  *See Wood v. Bartholomew*, 516 U.S. 1, 7-8 (1995).

Additionally, while it may be true that the prosecution did not disclose the reports of officers Love and Christian, it did turn over Newbold's report.  That report included Buchholz's detailed assertions to Officer Christian that he (Buchholz) shot at "the girl at the Mini Barn" several times with a ".38 or a 9mm," hitting her twice in the back, and that he abandoned a green pickup truck after the crime.  (PCR Exhibit C.)  It also alerted the defense that "Larry Christian wrote a statement in regard to this."  (PCR Exhibit C.)  The only missing information is Buchholz's more general statement to Officer Love that he "killed the

girl at the Mini Barn," but Petitioner has not explained how this information adds anything of substance to that which the defense already knew.  When, as here, the defense is already aware of the essential facts that comprise the allegedly exculpatory information, the prosecution has not committed a *Brady* violation.  *Raley v. Ylst*, 470 F.3d 792, 804 (9th Cir. 2006) (citations omitted); *Lambert v. Blackwell*, 387 F.3d 210, 265 (3d Cir. 2005); *Spirko v. Mitchell*, 368 F.3d 603, 611 (6th Cir. 2004).

      3.   <u>Susan Browning</u>

Petitioner next contends that the prosecution failed to turn over *Brady* material related to the unusual circumstances surrounding vehicle accidents involving one of its trial witnesses, Susan Browning.

Browning was one of several trial witnesses who claimed to have seen Petitioner in the Michelbacher van on the day of her death.  During the post-conviction proceeding, defense counsel learned for the first time that Browning had reported a mysterious highway accident that had occurred the day before Petitioner's preliminary hearing.  She claimed that as she was driving he car outside of town, the window on the passenger side of her car "exploded" as a "dirty looking green Jeep" passed her.  Browning suspected that a gunshot had caused the explosion, and she was afraid that the incident might have been related to her status as a witness in Petitioner's case.  Eventually, she stopped at a farmhouse and called a law enforcement officer to report the incident.

Browning also claimed that a similar incident happened about a year later, after

Petitioner's trial.  This time, however, it was her rear window that shattered and she did not see a vehicle.  She called the Idaho State Police to determine if anyone had been firing a weapon in the vicinity on that day, but she did not report the incident to local law enforcement.  Defense counsel did not learn about Browning's highway travails until the post-conviction proceeding.

This Court finds Browning's out of court experiences to be extremely tangential to this case.  Though it is true that a witness's credibility is always at issue in a trial, Petitioner has not demonstrated how he could have used Browning's statements about these matters as impeachment material.  His claim that her bias would have been established by her ill-defined fear that the highway incidents may have somehow been related to this case is equally tenuous.  Further, the second incident did not occur until long after the trial, so it could not have been disclosed or used before that time.

Yet even if the Court assumes that the information was favorable to Petitioner in some way and had been withheld by the prosecution or its agents, the Court concludes, for the reasons that follow, that Petitioner has not established that he was prejudiced.

4.    Prejudice/Materiality Analysis

In applying the materiality standard, the Supreme Court has advised that "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434.  Because the

**Memorandum Decision and Order - 22**

withheld evidence must be viewed collectively, rather than item by item, this Court will bring the undisclosed Kevin Buchholz material back into the analysis, in an abundance of caution, to determine the net impact on Petitioner's right to a fair trial.

The Court begins with a review of the evidence supporting Petitioner's guilt, which was circumstantial but extremely compelling, the most damning of which related to the murder weapon and the results of ballistics testing. That evidence demonstrated that the weapon that fired the bullets that killed Susan Michelbacher was found near the car that Petitioner had recently abandoned on a roadside in Nevada, and .38 caliber ammunition like that used in the murder was retrieved from inside of the vehicle. A witness had seen Petitioner with a similar handgun in his possession, and a gun store owner testified that Petitioner had purchased .38 caliber ammunition, like that found in the abandoned car, a few days before Michelbacher was murdered.

Additionally, two bank tellers testified that Michelbacher withdrew a total $2,000 early on the morning of her death, and Petitioner was seen with a significant amount of cash after the murder; his rather unbelievable explanation, given his spotty work history at the time, was that he had just "come into some money."

Several witnesses claimed to have seen Petitioner or someone who looked like him in the Micheblacher van on the day that she was killed, and long hairs that were consistent with his hair were found inside that van. A pubic hair that was consistent with Petitioner's hair was discovered on the victim's body. Serological tests revealed that Petitioner fell

**Memorandum Decision and Order - 23**

within about a relatively small percentage of the population that could not be excluded as a potential source of the semen, while another suspect and Michelbacher's husband had been excluded from that pool.  And when Petitioner was arrested in Nevada and informed that Michelbacher's homicide may have been avoided had he been apprehended sooner, he said "I did it."

In short, the State's evidence placed the murder weapon in Petitioner's hands, put him in the Michelbacher van, included him within a small pool of potential sources for the semen that was found in the victim's body, dropped an unexplained roll of cash in his pocket, and, arguably, had him taking responsibility for the crimes from his own mouth.  Nothing about this picture would have changed in his favor had the prosecution turned over all of the material related to Buchholz and Browning.

First, if the state court would have allowed Petitioner to explore Buchholz's confession to the Baldwin homicide, the prosecution would have then been permitted to show that the confession was unreliable and most likely false.  When Buchholz was arrested, he was ranting about several different topics.  He quickly recanted, claiming that he was just spouting off because he was drunk and angry at being taken into custody on other charges. Although Petitioner makes much of Buchholz's apparent knowledge of a few details of the Baldwin homicide, he has not shown that Buchholz would have been unable to gather these facts from the media, community gossip, or other sources.  Once the door was open to the Baldwin matter, the prosecution would have surely been permitted to introduce a wealth of

**Memorandum Decision and Order - 24**

information that squarely implicated Petitioner in that murder.  The sting from this evidence would not have been offset by any corroborating evidence of Buchholz's involvement in the Michelbacher homicide, as Petitioner had none.  Therefore, Petitioner has not shown how this case would have been placed in a more favorable light had the Buchholz material been disclosed.  Indeed, if anything, it is likely that the proceeding would have tacked decidedly in a more *negative* direction for Petitioner.

Adding the Browning's strange highway mishap into the mix does not help Petitioner in any appreciable way, as Browning's credibility had already been seriously challenged during cross-examination.  She acknowledged that she had changed her statement to police officers about the van sighting several times, and each time her memory mysteriously improved.  She also claimed that she could see the particular brand of jeans that Petitioner was supposedly wearing while he was sitting in the driver's seat of the van, despite being forced to admit that the vehicle's door blocked her line of sight.  (Tr. Vol. IV, p. 1091.) Impeachment material derived from the "exploding window" stories, to the extent that any existed, would have been largely cumulative, providing only a marginal benefit.  *See Williams v. Woodford*, 384 F.3d 567, 598-99 (9th Cir. 2004) (holding that the failure to disclose cumulative impeachment evidence did not amount to a *Brady* violation because it would not have cast the witness in a significantly worse light).  What's more, Browning's testimony did not stand alone on a critical issue; other witnesses testified that they either saw Petitioner or someone who looked like him in the van the day Susan Michelbacher was

**Memorandum Decision and Order - 25**

murdered.

After taking all of the evidence into account, including the allegedly withheld evidence, the Court concludes that Petitioner has not shown a reasonable probability that the result of the trial would have been different had the State turned over the Buchholz and Browning material. The Court's confidence in the fairness of the trial and its result has not been undermined by the prosecution's non-disclosure of these items, and the *Brady* claim shall be denied.

### Claim 4:  The "I did it" Statements

In his fourth claim, Petitioner contends that the admission of statements that he had made after his arrest violated his Fifth and Fourteenth Amendment rights, as interpreted by *Miranda v. Arizona*, 384 U.S. 436 (1966). He also argues that this evidence was so unreliable that its introduction violated the constitutional requirement of heightened reliability in capital cases.

1.   Factual Record Developed in State Court

Petitioner was arrested by two Nevada law enforcement officers at a truck stop and casino, but those officers did not interview or interrogate him. When Idaho officers Victor Rodriguez and Dennis Shaw arrived at the scene, Petitioner was handcuffed and bent over the trunk of a patrol car. As they approached, Petitioner turned toward them and said, "I did it." Detective Rodriguez then advised Petitioner of his rights. A Nevada officer saw Petitioner respond to Rodriguez by first nodding his head as if he understood his rights, and

**Memorandum Decision and Order - 26**

then, after Rodriguez said something else that the officer could not hear, shaking his head from side to side.  (Tr. Vol. V.,  pp.1418, 1424-25.)

After a brief stop at the local police station, Petitioner was transported  to a highway patrol substation for processing.  Once there, Detective Shaw made a comment to the effect that if he had arrested Petitioner earlier, three victims would still be alive.  In response, Petitioner again stated, "I did it."[5]

The "I did it" statements were not memorialized in any law enforcement officer's initial report, and did not show up in supplemental reports until months later.  The statements were nevertheless admitted into evidence at the Michelbacher and Baldwin trials, over Petitioner's objection, and would have been presented at a trial in the Haddon matter had Petitioner not entered a conditional guilty plea.

On appeal, the Idaho Supreme Court determined that Petitioner's first statement, which he made at the scene of the arrest, was admissible as a voluntary and spontaneous comment, regardless whether it occurred before or after he had been read his *Miranda* rights. *Rhoades*, 822 P.2d at 971.  With respect to the second statement at the highway patrol substation, the court found that although Shaw had engaged in the "functional equivalent of interrogation" while Petitioner was in custody, implicating *Miranda*, Petitioner's statement

---

[5]   The state court record reflects that Shaw followed this remark with something similar to "the girl in Blackfoot, and the two in Idaho Falls," to which Petitioner repeated, "I did it." (Tr. Vol. III, p. 898.)  Shaw's follow up comment was sanitized by stipulation at trial to exclude the reference to other victims.  For simplicity, the Court will refer to Petitioner's combined comments at the substation as the second "I did it" statement.

**Memorandum Decision and Order - 27**

was admissible because he had been advised of his rights, which he indicated that he understood, and he had not invoked his right to silence. *Id.* at 971-72.

　　　2.　　The *Miranda* Claim

　　In *Miranda*, the United States Supreme Court set forth the now familiar rule that before a law enforcement officer interrogates an individual who is in custody, the officer must inform the individual of his right to silence and his right to have the assistance of an attorney. 384 U.S. at 475-78. Absent a knowing and voluntary waiver of those rights, any statement taken during custodial interrogation will be excluded from evidence. *Id.* at 476. The prosecution has the burden to show a valid waiver, but such a waiver may be implied, rather than expressed, based upon a totality of the circumstances. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). A spontaneous and voluntary statement that is not the product of police interrogation or its functional equivalent will be admissible regardless whether the individual was warned of his rights. *Miranda*, 384 U.S. at 478.

　　In the present case, the Idaho Supreme Court's finding that the first "I did it" statement was voluntary and not the product of police questioning is supported by the record. The officers who claimed to have heard the comment all testified that Petitioner blurted it out as the Idaho officers approached him. In *Miranda* itself, the Supreme Court noted that "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." 384 U.S. at 478.

　　Regarding the second statement, this Court concludes that the Idaho Supreme Court's

**Memorandum Decision and Order - 28**

factual determinations that Petitioner was warned of his rights when he was arrested, he understood those rights, and he did not assert his right to silence when he shook his head, are all reasonable findings based upon the record that was before the court and are presumed to be correct here. *Rhoades*, 822 P.2d at 970-71. Although Petitioner argues that he invoked his right to silence by shaking his head negatively in response to something that Rodriguez said to him, he has not presented any evidence that would rebut the state court's factual finding to the contrary. The Idaho Supreme Court noted that while one police officer assumed that Petitioner was indicating that he did not want to answer questions, there was no conclusive evidence in the record that support that assumption. *Id*. at 971.

This Court also concurs with the Idaho Supreme Court that Detective Shaw's comment, which the state court found was "made to the defendant," amounted to the functional equivalent of interrogation for purposes of *Miranda*. *Id*. at 971. Shaw's comment carried an implied accusation that Petitioner had committed three homicides, which was reasonably likely to elicit an incriminating response. *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980).

However, the Idaho Supreme Court's application of the rule of constitutional law relating to an individual's waiver of *Miranda* rights is more problematic. The state court declared that, "the *Miranda* rule does not require police to maintain total silence toward the suspect until they are presented with a valid waiver of *Miranda* rights . . . [a]fter rights are read to and acknowledged by the detainee and until the right to silence or counsel is asserted,

**Memorandum Decision and Order - 29**

the police may initiate questioning." *Id*. at 971. To the extent that the Idaho Supreme Court applied a rule that requires a defendant to shoulder a burden to affirmatively prove that he had invoked his right to silence or counsel, this was an incorrect statement of law. Rather, the *prosecution* must demonstrate that a defendant has waived his rights before a statement that was made during custodial interrogation will be admissible. *Miranda*, 384 U.S. at 475; *Butler*, 441 U.S. at 373. To the extent that the state court's ultimate decision was perhaps a less than artful determination that Petitioner had implicitly waived those rights, this Court agrees.

A waiver need not be expressed orally or in writing but instead may be implied based upon the facts and circumstances of the case. *Butler*, 441 U.S. at 373. Though silence alone is insufficient, a waiver may be "inferred from the defendant's understanding of his rights coupled with a course of conduct reflecting his desire to give up his right to remain silent and have the counsel of an attorney." *Fare v. Michael C.*, 442 U.S. 707, 724 (1979). That situation exists here.

Petitioner had been advised of his rights at the time of his arrest, and he indicated that he understood those rights. The state courts acknowledged that Petitioner may have been under the influence of narcotics, but they credited the officers' testimonies that he was alert enough to understand what was going on around him. *See Rhoades*, 822 P.2d at 971. This is a reasonable finding of fact based upon the record, and the presumption of correctness has not been rebutted. 28 U.S.C. § 2254(d). Further, this Court will not disturb the Idaho

**Memorandum Decision and Order - 30**

Supreme Court's finding, after resolving some potentially conflicting evidence, that Petitioner did not invoke his right to silence by shaking his head in a negative fashion when he was detained.

The second "I did it" statement occurred relatively soon, though not immediately, after Petitioner's arrest and the reading of *Miranda* warnings.  And while his statement may have been elicited by Detective Shaw's remark, it was not the product of a coercive interrogation in the classic sense of a lengthy interview designed to extract a full and detailed confession, nor was it even in response to pointed questioning.  Rather, it was uttered during a brief exchange during the preliminary phases of booking and processing in which the arresting officer made an offhand comment.  There is no showing that any officer used force, pressure, or trickery to disgorge a waiver or a confession from Petitioner.  Under the totality of the circumstances, then, this Court concludes that Petitioner waived his *Miranda* rights when, with an awareness and understanding of those rights, he responded to Shaw's comment.

In order to avoid this conclusion, Petitioner seeks to present evidence that was not developed in the state courts.  He relies on new testimony that Detective Shaw gave during a 1996 deposition in this case.  In that testimony, Shaw refers to a short conversation that he had with Petitioner about an unrelated burglary while he was transporting Petitioner to the substation, before Petitioner made his second "I did it" statement:

> When we were in the car and I started to talk to him about – I was talking about [the burglary of] Lavaunda's Lingerie and only Lavaunda's

**Memorandum Decision and Order - 31**

Lingerie in the car because I wanted to start chronologically and get this whole thing – you know, I wanted to start there because that's where my warrant was.  And he said he didn't want to talk about it, get these handcuffs off of him because it was cramped in that car, and it was cramped.  It was cramped for me and I'm pretty good sized, too, so I understood that, and so I – when we got inside I took the handcuffs off and then we, you know, proceed to talk.

(Shaw Deposition, pp. 81-82.)

Petitioner seeks to include this evidence to support his contention that rather than waive his rights, he specifically invoked his right to silence about the murders when he stated that he "didn't want to talk about it" in response to Shaw's discussion about the burglary of Lavaunda's Lingerie.  This Court previously denied Petitioner's request for an evidentiary hearing to present this evidence, finding that he had been given full and fair opportunities to develop the facts in state court.  (Docket No. 94, pp. 8-9.)  The Court further concluded that Petitioner could not blame his trial counsel for his failure to do so, because he had not properly and independently exhausted an ineffective assistance of counsel claim on that basis.  (Docket No. 94, pp. 9-10.)

The Court has since excused the default of Petitioner's claims of ineffective assistance, opening the possibility that Petitioner could now argue that his counsel's ineffectiveness led to his failure to develop this evidence in state court.  He has also raised that precise point as an independent claim in this proceeding.  Regardless, even if the new evidence is taken into consideration, the Court concludes that Petitioner would still not be entitled to relief.

**Memorandum Decision and Order - 32**

The brief exchange in the patrol car involved an unrelated burglary, not the murder of Susan Michelbacher, and when Petitioner said that he "didn't want to talk about it, get these handcuffs off," he was apparently complaining about the cramped conditions of the car. Shaw understood Petitioner's comment to mean that he did not want to discuss the burglary charge until he was out of the car and free from the uncomfortable conditions. (Shaw Depo., p. 82.) This was a reasonable interpretation under the circumstances, and Petitioner's remark was at most an ambiguous or equivocal statement regarding his right to silence.

In a related context, the Supreme Court has held that an ambiguous reference to the assistance of counsel is insufficient to invoke that particular right under *Miranda* or to shut down further police questioning. *Davis v. United States*, 512 U.S. 452, 458 (1994). While neither the Supreme Court nor the Ninth Circuit has yet concluded whether the *Davis* rule applies to an ambiguous invocation of the right to silence, several jurisdictions have so held, and this Court is persuaded by their reasoning. *See, e.g. Simmons v. Bowersox*, 235 F.3d 1124, 1131 (8th Cir. 2001); *United States v. Hurst*, 228 F.3d 751, 759-60 (6th Cir. 2000); *United States v. Banks*, 78 F.3d 1190, 1198 (7th Cir. 1996), *vacated on other grounds by Mills v. United States*, 519 U.S. 990 (1996); *Medina v. Singletary*, 59 F.3d 1059, 1100 (11th 1995); *cf. Evans v. Demosthenes*, 98 F.3d 1174, 1176 (9th Cir. 1996) (concluding that the issue need not be resolved). Because Petitioner's comment in the patrol car did not constitute a clear and unambiguous invocation of his right to cease all discussion, he has misplaced his reliance on *Michigan v. Moseley*, 423 U.S. 96, 103 (1975) (holding that the police must

"scrupulously honor" a suspect's invocation of his right to silence).

    3.    <u>Heightened Reliability</u>

As an independent basis for relief, Petitioner asserts that the circumstances surrounding the "I did it" statements were so unreliable that his constitutional rights under the Eighth and Fourteenth Amendments were violated by the introduction of this evidence. In support, he relies principally on conflicting testimony from various law enforcement officers about whether they heard the statements, and on the failure of the officers to record the statements in their initial police reports.

It is true that the United States Supreme Court has indicated in a line of cases that enhanced standards of reliability are applicable to capital cases, particularly to capital sentencing procedures. *See, e.g., Lockett v. Ohio*, 438 U.S. 586 (1978); *Beck v. Alabama*, 447 U.S. 625 (1980). This requirement is based upon the qualitative difference between a sentence of death and any other sentence, and is designed to ensure accuracy and confidence in the "determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). Petitioner has cited no binding authority, and the Court is aware of none, that imposes a higher standard for the admissibility of evidence at the guilt phase of a capital trial than that which is required by the normal rules of evidence. This Court concurs with the Idaho Supreme Court that the "prosecution is not required . . . to prove the crime by any higher standard used in other criminal cases [and the] admission of evidence is not governed by separate rules applicable only to capital cases." *Rhoades*, 822

**Memorandum Decision and Order - 34**

P.2d at 970.

Petitioner was permitted to explore fully what he perceives as weaknesses in this evidence through his counsel's cross-examination of the law enforcement officers at trial. Counsel thoroughly tested the believability of the officers' claims that the omission of the inculpatory statements from the initial police reports was merely an oversight. The jury was also aware that some of the Nevada officers who were present did not hear the statements. It was well within the jury's capacity to sort out these discrepancies and assign whatever weight to the evidence that it determined was required. *See Hoffa v. United States*, 385 U.S. 293, 311 (1966) ("[t]he established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly-instructed jury"). Petitioner has not demonstrated constitutional error.

## Claim 5: Idaho Code § 19-2719

Petitioner claims that the application of Idaho's special capital post-conviction statute, Idaho Code § 19-2719, violated his Fourteenth Amendment rights to equal protection and due process of law.

Idaho's special post-conviction statute requires a capital defendant to raise all known legal or factual challenges to his conviction or sentence in one application for post-conviction relief within forty-two days of sentencing. Idaho Code § 19-2719(3). The direct appeal is held in abeyance pending completion of the post-conviction proceeding, and then the appeal

from the post-conviction matter is consolidated with the direct appeal.  Idaho Code § 19-2719(6).  Claims that were known or reasonably should have been known are forfeited if they were not included in the first post-conviction proceeding.  Idaho Code § 19-2719(5).

Petitioner's equal protection challenge is based upon the discrepancy between the forty-two day statute of limitations for capital defendants and, at the time of his case, the five year statute of limitations for non-capital defendants.  Petitioner has not shown that convicted capital defendants are considered to be a suspect or protected class, or that a particular type of state post-conviction procedure is a fundamental right, such that strict scrutiny must be applied to the statute.  *See, e.g., Dickerson v. Latessa*, 872 F.2d 1116, 1119 (1st Cir. 1989) (holding that requiring a defendant convicted of a capital offense to obtain permission to appeal the denial of a post-conviction motion does not deny equal protection).  Rather, the appropriate question is whether there is a rational basis for the State's decision to treat convicted capital defendants differently from non-capital defendants with respect to the time available in which to seek post-conviction relief.  *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985).  Under this standard, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest."  *Id.* at 440.  Idaho's statute survives this modest review.

In enacting Idaho Code § 19-2719, the Idaho Legislature expressed the State's interest in eliminating unnecessary delay in carrying out a valid death sentence.  The orderly and expeditious processing of collateral actions in capital cases is a legitimate governmental

**Memorandum Decision and Order - 36**

interest. *Cf. Barefoot v. Estelle*, 463 U.S. 880, 886-88 (1983); *see also Murch v. Mottram*, 409 U.S. 41, 45-46 (1972). Because the timeliness and waiver provisions of the statute are rationally related to this legitimate interest, the provisions withstand Petitioner's equal protection challenge. *Fetterly v. Paskett*, 747 F. Supp. 594, 600-01 (D. Idaho 1990) *remanded on other grounds* by 997 F.2d 1295 (9th Cir. 1993).

Petitioner next asserts that the shortened time period, apparently combined with the state court's failure to appoint new counsel for him during the post-conviction matter, deprived him of federal due process of law. Petitioner appears to argue that the interplay of the time limitation and the lack of new counsel prevented him from raising claims of ineffective assistance of trial counsel in state court. Whatever could be said about the operation of Idaho Code § 19-2719 to bar such claims, *see Hoffman v. Arave*, 236 F.3d 523 (9th Cir. 2001), this Court has since excused Petitioner's default, and those issues are now being considered on the merits. Thus, Petitioner can show no injury or prejudice. As to all other constitutional claims, the Court reaffirms its decision that the statute, as interpreted by the Idaho Supreme Court, comports with the due process baseline of providing capital defendants with adequate notice and a reasonable process in which to challenge their convictions and sentences. *Hoffman v. Arave*, 73 F.Supp.2d 1192, 1212-23 (D.Idaho 1998) *reversed and remanded on other grounds by* 236 F.3d 523 (9th Cir. 2001); *Fetterly v. Paskett*, 747 F. Supp. 594, 600-01 (D. Idaho 1990) *remanded on other grounds by* 997 F.2d 1295 (9th Cir. 1993).

**Memorandum Decision and Order - 37**

Accordingly, Petitioner has not shown that he is entitled to relief under either an equal protection or a due process theory.

### Claim 7:  Jury Instructions

In this claim, Petitioner contends that the trial court's jury instructions lowered the constitutional standard of proof necessary to convict and failed to provide guidance "as to critical evidentiary issues," in violation of his rights under the Sixth and Fourteenth Amendments.

1.    The Claim is not Barred by *Teague*

As a threshold matter, Respondent argues that Petitioner's claim must be dismissed under the non-retroactivity principles set out in *Teague v. Lane*, 489 U.S. 289 (1989).  In *Teague*, the Supreme Court held that a habeas petitioner is generally not entitled to the retroactive application of a new rule of constitutional law on collateral review.  *Id.* at 301. A constitutional rule is "new" for *Teague* purposes if it was not dictated by precedent that existed at the time that the petitioner's conviction was final in state court.  *Id.*

It has long been established that the Fourteenth Amendment's due process clause requires the State to prove every essential element of the crimes charged beyond a reasonable doubt.  *In re Winship*, 397 U.S. 358, 364 (1971).  In *Cage v. Louisiana*, 498 U.S. 33 (1990), the Supreme Court held, for the first time, that a jury instruction will deemed unconstitutional if there is a reasonable likelihood that the jury understood the instruction to allow a conviction without proof beyond a reasonable doubt.  *See Id.* at 41; *Cf. Estelle v. McGuire*,

**Memorandum Decision and Order - 38**

502 U.S. 62, 72 (1991) (clarifying that a reviewing court must determine whether there is a likelihood that the jury actually misunderstood its instructions).  Because *Cage* was issued well over a year before the Idaho Supreme Court finally resolved Petitioner's direct appeal, it is not "new" as applied to this case.  There is no need to speculate whether the state court was aware of *Cage*, as it cited and distinguished the case when it denied Petitioner's petition for rehearing.  *Rhoades*, 822 P.2d at 979-80.

Nevertheless, Respondent also contends that because Petitioner is challenging an instruction that refers to the "presumption of innocence" (Instruction 22), a matter that was ostensibly not at issue in *Cage*, he is still seeking the application of a new rule of law. (Docket No. 169, pp. 16-18; Docket No. 299, pp. 11-13.)  The Court is not persuaded.

Instruction 22 informed the jury that the presumption of innocence together with *the reasonable doubt standard* is not "intended to aid anyone who is in fact guilt [sic] to escape, but is a humane provision of the law, intended so far as human agencies can, to guard against the danger of innocent persons being unjustly punished."  (R., Vol. I, p. 590.)  Petitioner's argument is that this instruction, in conjunction with other instructions, made it reasonably likely that the jury based its verdict on a standard of proof below that which is required by the due process clause.  This is a relatively straightforward application of the *Cage* rule, albeit to an instruction that is worded differently.

The timing of the *Cage* decision is also what separates the present case from the Ninth Circuit's conclusion that a similar argument was *Teague*-barred in *Leavitt v. Arave*, 383 F.3d

**Memorandum Decision and Order - 39**

809, 817-818 (9th Cir. 2004). Leavitt's conviction became final one year before *Cage*, so he was unable to use its rule to his benefit. Conversely, this Court is free to reach the merits.

2.     The Reasonable Doubt Instructions

Petitioner's initial complaint is about the trial court's references in Instruction 23 to the terms "more evidence" and "moral certainty":

> Reasonable doubt is defined as follows: It is not mere possible doubt because everything related to human affairs and depending upon *moral evidence* is open to some possible or imaginary doubt. It is the state of the case which, after an entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, *to a moral certainty*, of the truth of the charge.

(R. Vol. I, p. 591; Instruction 23.) (Emphasis added.)

Petitioner also finds fault with the trial court's use of the term "moral certainty" in Instruction 26:

> The law does not require demonstration or that degree of proof which, excluding all possibility of error, produces absolute certainty for such degree of proof is rarely possible. *Moral certainty only is required*, which is that degree of proof which produces which produces conviction in an unprejudiced mind.

(R., Vol. I, p. 595; Instruction 26.) (Emphasis Added.)

In *Victor v. Nebraska*, 511 U.S. 1 (1994), the Supreme Court addressed similar complaints about the use of "moral evidence" and "moral certainty." There, the Court was untroubled by the phrase "moral evidence," because, when placed in the context of the words immediately surrounding it, the jury would have understood that "moral evidence" meant the

**Memorandum Decision and Order - 40**

same thing as "the proof introduced at trial." *Id*. at 13.  The Court was further reassured by language that informed the jury must base its decision solely on the evidence that had been presented at trial.  *Id*.  This is equally true here; the trial court clearly and repeatedly informed the jury that its decision must be based upon the evidence presented in court, rather than the "morality" of the alleged criminal acts.  (*See* Preliminary Instructions 2, 6, 7; Instructions 13, 15, and 23.)

The Supreme Court was slightly more concerned with the phase "moral certainty," which it noted may not bring the same archaic meaning to a modern jury (essentially, subjective certitude based on proof beyond a reasonable doubt).  Yet the Court still did not find constitutional error, as it determined that the rest of the instructions provided content to that potentially ambiguous phrase.  *Id*. at 14, 21. The jurors were told that they must have an "abiding conviction" of the truth of the charge, which, without reference to moral certainty, correctly states the prosecution's burden of proof and "does much to alleviate the concerns that the phrase 'moral certainty' might be misunderstood in the abstract." *Id*.  The Court further approved of language that equated a reasonable doubt with a doubt that would cause "a reasonable person to hesitate to act." *Id*. at 21.  These same qualifying remarks were included in the set of instructions in the present case, and the requirement that the jury may rely only on evidentiary proof, as in *Victor*, was a recurring theme throughout the trial court's instructions.  Petitioner's concerns about Instructions 23 and 26 are resolved by *Victor*.

Nor has Petitioner established any defect with the trial court's instruction to the jury

Memorandum Decision and Order - 41

that it must require the prosecution to "prove every material allegation in [the charges] beyond a reasonable doubt. " (Instruction 20.)  Far from working to Petitioner's detriment, this instruction reinforces the need to hold the prosecution to its correct constitutional burden. To the extent that Petitioner claims that the trial court committed constitutional error in failing to define the "material" allegations, he is mistaken.  The court's elements instructions contained all of the material allegations of the crimes charged.

For all of these reasons, Instructions 20, 23 and 26 pass constitutional muster.

More problematic is the trial court's use of Instruction 22, which reads in its entirety:

> The rule of law which clothes every person accused of crime with the presumption of innocence, and imposes upon the state the burden of proving his guilt beyond a reasonable doubt, is not intended to aid anyone who is in fact guilt [sic] to escape, but is a humane provision of the law, intended so far as human agencies can, to guard against the danger of innocent persons being unjustly punished.

(R., Vol. I, p. 590.)

Courts reviewing similar "protect the innocent" instructions have generally condemned them, though this is not a universal opinion.  *See Reynolds v. United States*, 238 F.2d 460, 463 (9th Cir. 1956) (holding, on direct review, that a similar instruction created prejudicial error); *Gomila v. United States*, 146 F.2d 372, 373 (5th Cir. 1944); *United States v. Doyle*, 130 F.3d 523, 538 (2d Cir. 1997); *but see DelValle v. Armstrong*, 306 F.3d 1197, 1200 (2d Cir. 2002) (holding that no habeas relief under AEDPA was available on a similar instruction)*; State v. Schiappa*, 728 A.2d 466, 486 (Conn. 1989) (disapproving of instruction, but rejecting a constitutional challenge); *Heald v. State*, 492 N.E.2d 671 (Ind. 1986) (noting

**Memorandum Decision and Order - 42**

that the instruction had been approved).  The danger inherent in such an instruction is that the jury could conclude that it need not apply the presumption of innocence, nor hold the prosecution to its burden to prove the defendant's guilt beyond a reasonable doubt, if it has first determined by some undefined standard that the defendant is actually or "in fact" guilty. The presumption of innocence and the reasonable doubt standard, of course, apply at all criminal trials, and any implication to the contrary is improper.  *See, e.g., Doyle*, 130 F.3d at 538.

On the other hand, a more benign interpretation of this instruction is that it simply explains to the jury *why* the presumption of innocence and the reasonable doubt standard must apply to *all* criminal defendants.  *See Leavitt*, 383 F.3d at 844 (Fernandez, J., concurring).  Even so, this Court does not doubt that the trial court's use of Instruction 22 in this case was unwise.

It is not enough, however, for this Court to find that the instruction is "'undesirable, erroneous, or even 'universally condemned.'"  *Cupp v. Naughten*, 414 U.S. 141, 147 (1973). Instead, the Court must be convinced that there is a reasonable likelihood that the jury in this case understood the instructions as a whole to allow a guilty verdict based on proof less certain than beyond a reasonable doubt.  *Victor*, 511 U.S. at 6.  The Court is not persuaded that such a likelihood exists.

The jury would have been disabused of any misleading construction of Instruction 22 by the trial court's numerous other instructions that properly defined the jury's obligation to

**Memorandum Decision and Order - 43**

hold the State to its correct burden.  The jury was informed of the following: (1) Petitioner was "presumed to be innocent unless and until he was proven guilty beyond a reasonable doubt," and he began the trial with a "clean slate with no evidence against him." (Preliminary Instruction 2; Instruction 23); (2) the State had the burden to prove every material allegation for each crime charged in this case beyond a reasonable doubt (Instructions 20, 23, 26); (3) the jury's decision must be based solely upon the evidence presented in court, and not on any other consideration (Preliminary Instructions 2, 6, 7; Instructions 13, 15, and 23); (4) passion, prejudice, and sympathy must not be considered (Preliminary Instruction 1); and (5) the jury must not convict solely on circumstantial evidence unless it was convinced that the circumstances could not be reconciled with any other rational theory of innocence (Instruction 7).  When read together, these instructions notified the jury that the presumption of innocence and the reasonable doubt standard must be applied in the specific case before it, eliminating any potential ambiguity in Instruction 22 on that score.

Still, Petitioner cites Chief Judge Winmill's conclusion in *Leavitt* that an identical instruction, when viewed in light of other "confusing and ambiguous instructions" in that case, diluted the State's burden of proof.  (*Leavitt v. Arave*, Case No. CV 93-24-S-BLW, Docket No. 141, p. 15.)  Petitioner argues that even though the district court's granting of relief was reversed on *Teague* grounds, its merits-based decision should control here.  The Court disagrees and finds several material distinctions between the instructions in this case and the instructions given in *Leavitt*.

**Memorandum Decision and Order - 44**

First, the trial court here gave an expanded definition of reasonable doubt that was not given in *Leavitt*.  This additional language informed the jury that Petitioner "is presumed innocent until the contrary is proved, and in a case of reasonable doubt whether his guilt is satisfactorily shown, he is entitled to an acquittal."  (R. Vol. II, pp. 591-92; *Leavitt v. Arave*, Case No. 93-024-S-BLW, Docket No. 120, p. 90 n.31.)  The trial court further informed the jury that Petitioner "though accused, begins the trial with a clean slate with no evidence against him," and that "nothing but legal evidence presented before the jury" could be considered."  *Id*.  The trial court also included the "hesitate to act" language that the Supreme Court acknowledged was proper in *Victor*.

Conversely, the set of instructions in this case did not include some of the other "confusing and ambiguous" instructions that were present in *Leavitt*.  Absent here was an instruction that indicated that the jury "should," rather than "must," require the prosecution to prove each element of the offenses beyond a reasonable doubt.  (Case No. 93-024-S-BLW, Docket No. 120, pp. 93-94.)  Also absent was an instruction that placed the burden of proving an alibi on the defendant.  (Case No. 93-024-S-BLW, Docket No. 120, p. 97, n.35.)

Furthermore, the district court's decision in *Leavitt* must now be viewed through the lens of the Ninth Circuit's decision on appeal, and while the appellate court ultimately decided that Leavitt's claim was *Teague*-barred, it made several observations on its way to this conclusion that betrayed its skepticism with the merits-based decision.  Perhaps most relevant is that the *Leavitt* panel did not believe that the surrounding instructions were as

**Memorandum Decision and Order - 45**

confusing, ambiguous, or misleading as the district court found them to be.  *Id*. at 821.  The Ninth Circuit was not overly concerned with instructing the jury that it "should," rather than "must," require proof beyond a reasonable doubt.  *Id*. at 822.  It was equally untroubled by the trial court's use of "moral evidence," "moral certainty," and "not mere possible doubt," noting that a nearly identical reasonable doubt instruction was upheld in *Victor*.  *Id*  It also found unproblematic an instruction that informed the jury that the prosecution need not prove every fact in the case beyond a reasonable doubt, only every element of the crimes charged.  *Id*.  Though the Ninth Circuit did conclude that the trial court's alibi instruction erroneously placed a burden on the petitioner, it determined that the instruction did not play a significant role in the jury's understanding of reasonable doubt.  *Id*. at 823.

Accordingly, given that the entire set of instructions in this case properly and repeatedly informed the jury that Petitioner was entitled to the presumption of innocence and that the State was required to prove his guilt beyond a reasonable doubt, and in light of dispositive differences between the present case and *Leavitt*, this Court concludes that there is no reasonable probability that the jury convicted Petitioner using a standard of proof lower than beyond a reasonable doubt.

### 3.    Other Instructions

Petitioner also contends that the trial court failed to provide the jury with guidance as to the distinction between general and specific intent, included a deficient instruction related to the defendant's failure to testify, improperly used the word "innocent" instead of "not-

guilty," and erred in not giving Petitioner's proffered instruction on identification testimony. (Docket No. 175, pp. 22-23.)  None of these sub-claims has merit.

The Idaho Supreme Court has already rejected the argument that the jury instructions were deficient with respect to defining general and specific intent, *see Rhoades*, 922 P.2d at 972-73, and this is a question of state law over which this Court has no authority to intrude. *Estelle v. McGuire*, 502 U.S. 62, 71 (1991).  Petitioner has also failed to explain how the instruction informing the jury that it must not consider the fact that Petitioner did not testify, and the trial court's use of the word "innocent" instead of "not guilty," were in any way constitutionally deficient.  Finally, Petitioner has not favored the Court with any authority or specific argument supporting his claim that a cautionary instruction on identification testimony was constitutionally required in this case.

**Claim 8:  Victim Impact Statement**

Petitioner next alleges that the "trial court, in imposing sentence upon [Petitioner], relied upon inadmissible victim impact statement in violation of the Eighth and Fourteenth Amendments to the Constitution of the United States."  (Docket No. 175, p. 24.)

In *Booth v. Maryland*, 482 U.S. 496 (1987), the Supreme Court held that the introduction of victim impact evidence at the sentencing phase of a capital trial violates the Eighth Amendment.  Four years later, in *Payne v. Tennessee*, 501 U.S. 808 (1991), the Court overruled *Booth* in part, holding that evidence regarding the personal characteristics of the victim and the impact of the victim's death on his or her family members was not *per se*

**Memorandum Decision and Order - 47**

inadmissible. *Id.* at 829. The *Payne* Court did not decide whether statements from family

members about the crime, the defendant, or the appropriate punishment would also be

admissible. *Id.* at 829 n.2. Thus, the portion of *Booth* that prohibited that type of evidence

has apparently survived *Payne*.

In the present case, Petitioner relies on the following statement by Susan

Michelbacher's husband, which was included in the presentence investigation report:

> Mr. Michelbacher expressed a dissatisfaction with the criminal justice system
> and its tendency to protect the criminal. He seemed to be harboring a
> significant amount of anger in addition to his grief and sorrow. He stated he
> wanted to see justice done. He indicated that by the time justice is done, if
> justice is done, no one will remember who Susan Michelbacher was or what
> Paul Rhoades did to her.

Mr. Michelbacher's desire to "see justice done" is a thinly veiled opinion that

Petitioner should receive the death penalty, particularly when it is considered in light of his

remark that "by the time justice is done, if justice is done, no one will remember who Susan

Michelbacher was or what Paul Rhoades did to her." The Idaho Supreme Court found that

Mr. Michelbacher's fuller comments, which referenced both the impact of Susan's death on

the family and Mr. Michelbacher's opinion about the appropriate punishment, as falling

within the category of statements that the Supreme Court had determined were improper

under *Booth*. *Rhoades*, 822 P.2d at 974-975. The state court did not discuss *Payne*, but

because at least part of Mr. Michelbacher's statement appears to be an opinion about the

appropriate punishment, that portion would have still been inadmissible even after *Payne*.

The Idaho Supreme Court nonetheless found any error to be harmless beyond a

**Memorandum Decision and Order - 48**

reasonable doubt.  *Id.* at 975.  This Court agrees.  In its findings, the trial court noted that "a husband is left without a wife, a child without a mother, an a community without the valuable contribution of a conscientious school teacher."  (R. Vol. III, p. 728.)  These unadorned facts were available to the court from having presided over the trial.  There is no indication that Mr. Michelbacher's rather oblique statement influenced or swayed the trial court beyond the evidence that it had already heard, and this Court is satisfied, beyond a reasonable doubt, that any error did not contribute to the trial court's decision to impose death sentences.  *See Chapman v. California*, 386 U.S. 18, 24 (1967).[6]

### Claim 9:  Weighing of Mitigating and Aggravating Circumstances, Consideration of Mitigating Evidence, and Allegations of Arbitrariness

In Claim 9, Petitioner contends that the trial court did not follow the correct weighing procedures, failed to consider sentencing alternatives, ignored evidence offered in mitigation, and imposed death sentences based upon passion and prejudice.

Petitioner's first contention, that the trial court did not follow correct weighing procedures, is based on *State v. Charboneau*, 774 P.2d 299 (Idaho 1989).  In *Charboneau*, the Idaho Supreme Court construed Idaho Code § 19-2515(c) as requiring district courts to weigh all mitigating evidence collectively against each aggravating circumstance found to exist individually.  *Id*. at 323.  This is an issue of statutory construction.  The United States Constitution does not impose this particular requirement, and the Supreme Court has left the

---

[6] Because the Court concludes that any error would be harmless under *Chapman*, it does not need to resolve whether the more stringent test under *Brecht* is applicable to this claim.

development of weighing procedures largely to the states. *Kansas v. Marsh*, 126 S.Ct. 2516, 2525 (2006). Whether the trial court complied with *Charboneau* is solely a question of state law that is not reviewable on habeas review. This is equally true of Petitioner's argument that the trial court did not consider all sentencing alternatives, allegedly in violation of *State v. Leavitt*, 775 P.2d 599 (Idaho 1989).

Petitioner is correct that he had a constitutional right to have the sentencer consider all relevant evidence that may call for a sentence less than death. *Eddings v. Oklahoma*, 455 U.S. 104, 114-115 (1982). But the trial court actually considered his mitigating evidence, including Petitioner's education, social and economic status as a child and an adult, vocational skills, drug and alcohol use, his cooperative nature while incarcerated, the lack of a prior felony record, and his trusted status as a babysitter and friend to the women in his life. (R. Vol. III, pp. 715-716.) Petitioner's real complaint might be that the trial court did not afford this evidence as much weight as he would have liked, but the Constitution does not demand that the factfinder place any particular weight on the evidence that is presented. *See, e.g., Eddings*, 455 U.S. at 114-115.

Petitioner has shown nothing that would indicate that the trial court's decision was based on passion or prejudice as opposed to its findings of fact and the application of the law to those facts. This Court finds nothing untoward, let alone unconstitutional, in the trial court's use of words such as "morally vacant" and "totally devoid of conscience" to describe these crimes. To be sure, the criminal acts – which included the kidnapping of a random

**Memorandum Decision and Order - 50**

person from a store parking lot, forcing her to withdraw money from her bank account, raping her, shooting her in the back, and then ejaculating in her mouth as she lingered near death – are unquestionably "morally vacant" and "totally devoid of conscience." The trial court's finding that Petitioner's "actions and conduct before and after the murder as set forth herein . . . reflects a total lack of remorse," was supported by the facts of the crimes and not by Petitioner's failure to testify.

In sum, the Court concludes that Petitioner's allegations do not show that the death sentences were imposed in an arbitrary or capricious manner. This claim is without merit.

### Claims 10 and 12:  The Death Sentence for Kidnapping

In addition to imposing a death sentence for murder, the trial court independently sentenced Petitioner to death for first-degree kidnapping under Idaho Code § 18-4505. Petitioner challenges this sentence, claiming that "[a] sentence of death for a crime less than murder is a violation of [his] rights under the Eighth Amendment to the Constitution of the United States, and is grossly disproportionate to the offense under the rules adopted in *Coker v. Georgia*, 433 U.S. 584 (1977); *Edmund v. Florida*, 458 U.S. 782 (1982)." (Docket No. 175, p. 27.)

In *Coker*, the Supreme Court held that a death sentence for the offense of rape is prohibited by the Eighth Amendment because the penalty is excessive and grossly disproportionate to that crime. *Id*. at 598. The Court emphasized, though, that the scope of its decision was limited to circumstances involving the rape of an adult woman who was not

killed:

> We have the abiding conviction that the death penalty, which 'is unique in its severity and irrevocability,' [citation omitted] is an excessive penalty for the rapist who, as such, *does not take human life*.

> \* \* \*

> It is difficult to accept the notion, and we do not, that the rapist, with or without aggravating circumstances, should be punished more heavily than the deliberate killer *as long as the rapist does not himself take the life of his victim*.

*Coker*, 433 U.S. at 598, 600 (emphasis added).  In a memorandum opinion issued the same day, the Supreme Court also found that a defendant's death sentence for kidnapping violated the Eighth Amendment, but, as in *Coker*, the victim had not been killed.  *Eberheart v. Georgia*, 433 U.S. 917 (1977) (reversing *Eberheat v. State*, 206 S.E.2d 12 (Ga. 1974)).

Five years later, the Court applied *Coker* to conclude that the Eighth Amendment prohibits a death sentence for a defendant who aided and abetted the commission of another felony that resulted in death, but who did not kill, attempt to kill, or contemplate that a life would be taken.  *Enmund v. Florida*, 458 U.S. 782, 801 (1982); *but cf. Tison v. Arizona*, 481 U.S. 137, 158 (1987) (holding that a death sentence does not offend the Eighth Amendment when the defendant was substantially involved in the crime that led to the victim's death, and the defendant had at least a reckless disregard for human life).

Courts have since construed *Coker* and its progeny as not erecting a *per se* bar on the death penalty for the crime of kidnapping when that crime resulted in the victim's death.  In *State v. Coleman*, 605 P.2d 1000, 1017 (Mont. 1979), the Montana Supreme Court rejected

**Memorandum Decision and Order - 52**

an Eighth Amendment challenge to the defendant's death sentence for aggravated kidnapping, noting that *Coker* "is relevant only to crimes for which the penalty has been imposed which did not result in the loss of a life." *Accord McKenzie v Osborn,* 640 P.2d 368, 381 (Mont. 1981); *see also State v. Keith*, 754 P.2d 474, 482-83 (Mont. 1988) (reaffirming the analysis).   Similarly, in upholding a death sentence for aggravated kidnapping, the Kentucky Supreme Court has distinguished *Coker* and *Eberheart* on the ground that "in neither of those cases was the victim of the rape and kidnapping also murdered." *Salinas v. Commonwealth*, 84 S.W.3d 913, 916 (Ky 2002).

This Court is persuaded that these subsequent cases have correctly interpreted the proper scope of *Coker* and its progeny, and the Court concludes that the Eighth Amendment does not automatically prohibit a death sentence when a kidnapping results in an intentional death.   Here, of course, Petitioner intentionally killed Susan Michelbacher, a fact that was specifically found by the trial court in its written findings in support of the death sentence for kidnapping.  (R., Vol. III, p. 730.)  While the Court has little doubt that a death sentence could be imposed under Idaho Code §§ 18-4504 – 4505 when the victim has not been killed, which would raise grave constitutional questions, this is not such a case.  The Court will leave for another day the constitutional issues that would arise in that scenario.

Petitioner next contends that the aggravating circumstances that the trial court relied upon to impose the death sentence for kidnapping are unconstitutionally vague and overbroad.

**Memorandum Decision and Order - 53**

To minimize the risk of wholly arbitrary and capricious infliction of a death sentence, states seeking to impose the death penalty must sufficiently channel and limit the sentencer's discretion. *See, e.g., Gregg v. Georgia*, 428 U.S. 153, 189, 206-207 (1976). A state's death penalty "system could have standards so vague that they would fail adequately to channel the sentencing decision patterns of juries with the result that a pattern of arbitrary and capricious sentencing . . . could occur." *Id.* at 195 n.46. Claims of vagueness or overbreadth directed at aggravating circumstances defined in capital punishment statutes assert that the challenged provision fails adequately to inform sentencers of what they must find to impose the death penalty. *Maynard v. Cartwright*, 486 U.S. 356, 361-62 (1988).

In the present case, the trial court found that three statutory aggravating circumstances from Idaho Code §18-4505 existed for the kidnapping conviction:

(a)    The victim of the kidnapping, Susan Michelbacher, was subjected by the kidnapper to rape and related sexual abuse, and the intentional infliction of grievous mental and physical injury. [Idaho Code § 18-4505(6)(a)]

* * *

(b)    The defendant, by kidnapping the victim and conducting himself as established by the evidence, knowingly created a great risk of death to the kidnapped victim which ultimately occurred under tragic consequences. [Idaho Code § 18-4505(6)(b)]

(c)    The kidnapping and associated actions of the of defendant could only have terrorized and caused severe mental anguish and horror to Susan Michelbacher during the last hours of her life.
       As a result of all the circumstances, the kidnapping was especially heinous, atrocious, cruel and manifested exceptional depravity. State v. Osborn, supra, The court finds that obviously Susan

**Memorandum Decision and Order - 54**

>Michelbacher was not released unharmed.  After being raped, she was
>murdered by defendant.  [Idaho Code § 18-4505(6)(d)]

(R. Vol. III, pp. 730-731.)

By the time of Petitioner's sentencing the Idaho Supreme Court had already placed

a limiting construction on "especially heinous, atrocious, or cruel, manifesting exceptional

depravity" (HAC), as that language appeared in Idaho Code § 19-2515(g)(5) (now Idaho

Code § 19-2515(9)(e)).  In *State v. Osborn*, 631 P.2d 187 (Idaho 1981), the court concluded

that:

>especially heinous means extremely wicked or shockingly evil; that atrocious
>means outrageously wicked and vile; and, that cruel means designed to inflict
>a high degree of pain with utter indifference to, or even enjoyment of, the
>suffering of others. What is intended to be included are those capital crimes
>where the actual commission of the capital felony was accompanied by such
>additional acts as to set the crime apart from the norm of capital felonies the
>conscienceless or pitiless crime which is unnecessarily torturous to the victim.

*Id*. at 200 (quoting *State v. Dixon*, 283 So.2d 1, 9 (Fla.1973)).  The state court also defined

the words "exceptional depravity" as applying only "to those situations where depravity is

apparent to such an extent as to obviously offend all standards of morality and intelligence."

*Id*.

The Ninth Circuit Court of Appeals has since determined that *Osborn's* limiting

construction is not unconstitutionally vague or overbroad.  *Leavitt v. Arave*, 383 F.3d 809,

836-37 (9th Cir. 2004).  Though the *Osborn* court's analysis was directed at the HAC

aggravator found in Idaho Code § 19-2515(g)(5), which was applicable to defendants who

have been convicted of murder, and the court did not expressly mention Idaho Code § 18-

4505(6), there is no reason that the limiting construction does not apply will equal vigor to the identical language in that statutory subsection.

Turning back to this case, the trial court cited *Osborn* when it found that Petitioner's acts during the kidnapping that resulted in the intentional homicide of Susan Michelbacher were especially heinous, atrocious, cruel and manifested exceptional depravity. It is clear that the trial court was aware of the limiting construction that *Osborn* had placed on the HAC aggravator (R. Vol. III, pp. 721-22, 30-31.) The trial court was therefore aware that it must find that the kidnapping and associated acts that resulted in the intentional killing of the victim were designed to inflict a high degree of pain and were conscienceless, pitiless, and unnecessarily torturous to the victim. Accordingly, the sentencer was provided sufficient guidance, and its discretion was sufficiently narrowed, to comply with the Eighth Amendment. Additionally, because the court weighed all mitigating circumstances against each aggravating circumstance individually, and indicated that its sentence would stand even if only one aggravator were present, any constitutional infirmities in the other aggravating circumstances would be harmless. *See Pizzuto v. Arave*, 280 F.3d 949, 970-71 (9th Cir. 2001).

Finally, Petitioner contends that the imposition of a death sentence for the crime of kidnapping when the kidnapping is the underlying felony supporting a felony murder allegation violated his right against "double jeopardy as guaranteed by Idaho law" under *State v. Sivak*, 731 P.2d 192, 206 (Idaho 1986), and *State v. Pizzuto*, 810 P.2d 680 (Idaho

**Memorandum Decision and Order - 56**

1991).  (Docket No. 175, p. 28.)  Petitioner's attempt to transform what appears to be a state law issue into a federal one simply by citing the Eighth and Fourteenth Amendments is unavailing.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

Furthermore, the double jeopardy clause of the Fifth Amendment protects, in part, against multiple punishments for the same offense, *see, e.g., Ohio v. Johnson*, 467 U.S. 493, 497-98 (1984) (citation omitted), and Petitioner has failed to show how he has been, or will be, punished more than once for the "same offense."  To the extent that Petitioner believes that his conviction for murder in the first degree is based only on a felony murder theory, and that the single underlying felony supporting that conviction was kidnapping, he is incorrect.  Instead, the murder charge was based on both a felony murder theory and a premeditated murder theory, and the felony murder option was based on the underlying crimes of kidnapping "and/or" rape.[7]  (R. Vol. I, p. 106.)  The trial court instructed jury on both premeditated and felony murder, and the jury returned a general guilty verdict without distinguishing between the two.  (R. Vol. III, pp. 612, 623.)  More than sufficient evidence supports both theories, and more than sufficient evidence supports the underlying alternative felony of rape.  As a result, Petitioner's punishment for first-degree murder could stand based on premeditated murder or felony murder based on the crime of rape, independent of the kidnapping conviction.

---

[7]  Petitioner's argument on this issue in his original Brief on the Merits appears to have been lifted from the Bingham County case, and has little or no relevance here.  (Docket No. 108, pp. 85-86.)  The Supplemental Brief on the Merits does not clarify the matter. (Docket No. 250, pp. 6-7.)

**Memorandum Decision and Order - 57**

## Claim 14:  Deprivation of Counsel

In the next claim, Petitioner alleges that because Russell Webb, a law partner of one of his trial attorneys, had represented a potential suspect in this case, Harry Burke, "on previous occasions," Petitioner's trial and appellate counsel were burdened by a conflict of interest.  (Docket No. 175, p. 31.)

To establish a Sixth Amendment violation under these circumstances, Petitioner must show that his counsel acted under a conflict of interest that adversely affected their performance.  *Mickens v. Taylor*, 535 U.S. 162, 173-74 (2002).  To show an actual conflict, Petitioner must demonstrate "that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests."  *United States v. Wells*, 394 F.3d 725, 733 (9th Cir. 2005) (internal quotation marks omitted); *see also United States v. Shwayder*, 312 F.3d 1109, 1118 (9th Cir. 2002) (alternatively describing the standard as requiring "that counsel was influenced in his basic strategic decisions" by the conflict).

Setting aside questions about Webb's rather limited involvement in this case before the post-conviction hearing, Petitioner has failed to allege any facts from which the Court could conclude that an actual conflict of interest adversely affected the quality of the representation provided to him.  Petitioner has not indicated precisely when Webb represented Burke, though it certainly does not appear that he did so at any critical point in this case.  In fact, John Radin has since testified that he had no recollection that Webb ever

represented Burke. (Radin Depo. p. 130.) And while it is true that some witnesses claimed

to have seen a person resembling Harry Burke riding in the Michelbacher van with Petitioner,

both Radin and Hart have testified that they investigated alternative suspects and were unable

to uncover any evidence that would tie Burke or anyone else to the homicides of Susan

Michelbacher. (Hart Depo. p. 116; Radin Depo. p. 149.) In other words, the failure to mount

a defense based upon an alternate suspect such as Burke was not due to an perceived conflict

of interest but was instead based upon a lack of evidence.

Therefore, Petitioner has failed to show that Webb's undefined prior representation

of Harry Burke influenced counsel in their most basic decisions during the course of the

representation in state court. This claim will be denied.

## Claim 17: Ineffective Assistance of Counsel

In his next to last claim, Petitioner raises twenty-eight separate instances of ineffective

assistance of counsel at trial, sentencing, post-conviction, and on appeal. In a comprehensive

Memorandum Decision and Order, dated May 18, 2006, this Court determined that Petitioner

was not entitled to an evidentiary hearing on nearly all of these issues.[8] (Docket No. 246.)

The Court found that most of the factual allegations, even if proven to be true, would not

entitle Petitioner to relief under the Sixth Amendment. The Court sees no reason to go over

this same ground a second time, and it will incorporate its previous analysis here. The

---

[8] The Court reserved its evidentiary hearing ruling in two areas: counsel's alleged failure
to rebut the State's physical evidence and counsel's alleged failure to conduct a reasonable
mitigation investigation. (Docket No. 246, p. 1.)

**Memorandum Decision and Order - 59**

majority of these issues will be denied without further comment.

The Court will instead limit its discussion to the following specific allegations:  (1) trial counsel were ineffective in failing to  present expert testimony to rebut the State's physical evidence, particularly the serological evidence; (2) counsel failed  to use evidence obtained in discovery to support a motion to suppress the "I did it" statements; (3) counsel did not investigate whether Kevin Buchholz could be an alternative suspect in this case; (4) counsel did not challenge the death sentence under the Eighth Amendment as excessive and grossly disproportionate to the crime of kidnapping; (5) counsel failed to argue that the HAC aggravating circumstance is unconstitutionally vague; and (6) counsel failed to investigate, develop, and present evidence in mitigation at the sentencing phase.

1.    Standard of Law

To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show that his counsel's performance was unreasonably deficient and that the defense was prejudiced as a result.  *Strickland v. Washington*, 466 U.S. 668, 684 (1984).

In assessing whether counsel's performance fell below an objective standard of reasonableness under the first part of the *Strickland* test, a reviewing court must view counsel's conduct at the time that the challenged act or omission occurred, and every effort must be made to eliminate the distorting lens of hindsight.  *Id*. at 689.  If counsel conducted a reasonable investigation, or decided that an particular investigation was unnecessary based upon the exercise of reasonable professional judgment, then counsel's subsequent tactical

decisions shall not be second-guessed.  *Id*. at 689-91.  The pertinent inquiry "is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable."  *Siripongs v. Calderon*, 133 F.3d 732, 736 (9th Cir. 1998).

To prove prejudice, the petitioner must demonstrate that there is a reasonable probability that but for counsel's unprofessional errors the result of the proceeding would have been different.  *Strickland*, 466 U.S. at 684.  A reasonable probability is one sufficient to undermine confidence in the outcome.  *Id*. at 694.

Unless the petitioner can show both deficient performance and prejudice, "it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable."  *Id*. at 687.

Guilt Phase Claims

1.      The FBI Report and Counsel's Failure to Rebut the State's Physical Evidence
        (Claim 17, ¶ 22)

At trial, forensic scientist Donald Wyckoff testified for the State that semen was discovered on three swabs taken from the victim's body.  Based upon a series of serological tests, including ABO blood typing, secretor status, and PGM typing,[9] Wyckoff concluded that Petitioner could not be excluded as a potential source of the semen.  (Tr. Vol. VI, pp. 1689-91.)

Before trial, State officials forwarded the swabs to the FBI so that a more refined

---

[9]  PGM is an enzyme that is present in blood, vaginal secretions, semen, and other bodily fluids.

serological test, known as PGM subtyping, could be conducted, but the those results were neither introduced into evidence nor discussed at trial.  In 2005, Petitioner retained a forensic scientist, Dr. Greg Hampikian, to review an eighteen-year-old report generated by the FBI's lab.  As a result of this review, Dr. Hampikian concluded that the report "did absolutely exclude [Petitioner] as a contributor of the semen."  (Docket No. 242, Appendix 2, June 30, 2005 Affidavit of Greg Hampikian, ¶ 6.)

This Court previously noted that Petitioner had failed to explain how Dr. Hampikian's opinion about the FBI report was connected to any allegations of ineffective assistance of counsel.  The Court further noted that Dr. Hampikian's conclusion appeared to have been based on a misreading of the report.  (Docket No. 246, pp. 5-6.)  The FBI lab reached a positive conclusion for only one of three swabs, and Dr. Hampikian referred to this result as **PGMsub 1-** when it was, in fact, **PGMsub 1+**.  This is a critical distinction.  While the correct result, PGMsub 1+, does not match the PGM detected in Petitioner's known blood sample, it does match the victim's.  If the source of the PGM on the swab was from the victim's own tissue rather than the semen, then the report would presumably be inconclusive.

Because of these uncertainties, the Court requested that Petitioner's counsel clarify the issue in his supplemental merits briefing.  Rather than taking that opportunity, counsel again waited until filing a supplemental reply brief to attach a new affidavit from Dr. Hampikian.[10]  (Docket No. 305.)  The Court is still left to speculate about the nature of

---

[10]  The Court does not approve of this type of litigation tactic.  Respondent has not been provided with an opportunity to respond in writing, which both increases the difficulty for the

**Memorandum Decision and Order - 62**

Petitioner's legal argument, and it is tempted to dispose of this matter on that basis alone. But even if the Court gives Petitioner the benefit of the doubt and assumes that the Hampikian evidence is intended to support Petitioner's claim that trial counsel were ineffective in failing to call an expert to rebut the prosecution's physical evidence (subpart 22), or perhaps in failing to impeach the State's expert witnesses (subpart 16), he would not be entitled to relief.

In his clarified affidavit, Dr. Hampikian now admits that his previous affidavit contained the typographical error, and he acknowledges that the FBI's result could be based on the victim's contribution to the swab, but he nonetheless maintains that "[t]he typographical error has no bearing on my conclusions." (December 21, 2006 Affidavit of Greg Hampikian, ¶ 1.)  He seems to assert that the report suggests one of two possibilities: (1) *if* the result was based on the semen, then Petitioner was excluded as the donor of the semen because he is not a match; or (2) *if* the test result instead reflected the victim's own tissue, then Petitioner would have at least been eliminated as the source of the PGM, excluding that test as a means of narrowing the class of semen donors.  (Hampikian Affidavit, ¶¶ 2, 3.)

Petitioner has not indicated how an opinion similar to Dr. Hampikian's would have materially assisted the defense at trial.  Certainly trial counsel could not have argued that the report exonerated Petitioner, because there is apparently no way of knowing whether it is the

---

Court in resolving the issue and muddies the record.

**Memorandum Decision and Order - 63**

second possibility – the victim's own tissue sample on the swab – that accounted for the

result.  Furthermore, co-counsel Stephen Hart covered this possibility extensively during his

cross-examination of Mr. Wyckoff, at least as it pertained to the State lab's result:

> Q.     Is it not possible, Mr. Wyckoff, that based on what you now told us that you
> would – in taking a body sample or a sample from the body of Susan
> Michelbacher, you could be reading her PGM, PGM-One?
>
> A.     That possibility exists, yes.
>
> Q.     So when you suggest that the sample you retrieved from her vaginal area or
> other parts of her body as a PGM-One which you've testified to, it's entirely
> possible that what you're seeing or reading is a PGM reading from the victim,
> Susan Michelbacher?
>
> A.     Yes.
>
> Q.     You cannot say, can you, that that PGM reading was in fact from someone
> else?  That's not possible, is it?
>
> A.     That PGM reading was from  – if it was from someone else, they had a PGM-
> One.
>
> Q.     So did the victim?
>
> A.     Right.
>
> Q.     So you can't tell where that reading came from; that correct?
>
> A.     Yes.

(Tr. Vol. VI, p. 1776-1778.)

Given this exchange, it is reasonable to infer that counsel had consulted with an expert

and chose not to go beyond suggesting that the typing done by the State's lab did not exclude

**Memorandum Decision and Order - 64**

the possibility that the result was based on the victim's PGM.  This is a presumptively reasonable strategic decision that has yet to be rebutted, particularly in the complete absence of any specific factual allegations related to counsel's investigation and decision-making on this topic, and Petitioner has not established that his counsel's performance was deficient under the Sixth Amendment.

Alternatively, Petitioner has shown no actual prejudice from counsel's supposed errors.  To the Court's understanding of Dr. Hampikian's clarified opinion, the most favorable argument that counsel could have made at trial was that the more refined FBI testing excluded Petitioner as a potential source of the PGM.  Perhaps Petitioner now intends to argue that defense counsel could have used the report in some fashion to deflect the State's suggestion that the PGM test narrowed the class of potential semen donors to a relatively small percentage of the population.  Yet even if that particular test were removed from the equation entirely, Wyckoff's testimony that Petitioner's blood type and secretor status still placed him within roughly thirty-two percent of the population that could have deposited the semen remains undisturbed.  (R. Vol. VI, p. 1690.)  Taking the analysis a step further, even if the State's general serological evidence were eliminated, the other incriminating evidence remained strong, including the ballistics, hairs found in the van and on the victim's body, the "I did it" statements, Petitioner's possession of the murder weapon, eyewitness accounts that placed him in the van, and his unexplained windfall of cash immediately after the homicide.

**Memorandum Decision and Order - 65**

As a result, this Court concludes that there is no reasonable probability of a different outcome had Petitioner's counsel developed and presented an opinion of the FBI report similar to the one now proposed by Dr. Hampikian. Because Petitioner's factual allegations (to the extent that he has presented any), even if proven to be true, would not entitle him to relief, the Court shall not conduct an evidentiary hearing on this claim. *See Earp v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir. 2005).

      2.    The Motion to Suppress  (Claim 17, ¶ 4)

Petitioner contends that his counsel should have used the information disclosed during discovery as a basis to suppress his "I did it" statements. Specifically, he faults counsel for not arguing that he actually invoked his right to silence after his arrest and for not developing evidence that he was under the influence at the time of his arrest and therefore could not have voluntarily waived his rights. (Docket No. 175, pp. 37-38.)

This Court has already addressed Petitioner's statement, in response to Shaw's discussion of the Lavaunda's Lingere burglary, that he "didn't want to talk about it." For the reasons given, Petitioner cannot show a reasonable probability of a different result had counsel used this evidence in support of the motion to suppress.

With respect to the intoxication evidence, Petitioner's counsel did, in fact, offer into evidence an affidavit from Petitioner showing his drug use around the time of his arrest. (Tr. Vol. I, p. 309; R. Vol. I, pp. 185-87.) The state supreme court acknowledged that evidence was presented showing that Petitioner was probably under the influence, but it credited the

Memorandum Decision and Order - 66

officers' testimony that he was aware of what was going on around him. *Rhoades*, 922 P.2d at 971. Petitioner has not demonstrated that his counsel's performance was unreasonably deficient by failing to offer more evidence of intoxication, or, even if they had, that there is a reasonable probability of a different outcome.

      3.    The Investigation Into Kevin Buchholz  (Claim 17, ¶ 14)

Petitioner argues that the defense team was unreasonably deficient in failing to conduct a more thorough investigation into the possibility that Buchholz was involved in these crimes. Again, this Court has extensively reviewed the Buchholz evidence in relation to Petitioner's *Brady* claim. Petitioner has not detailed what, precisely, a more extensive investigation would have revealed, other than the two additional police reports that had not been disclosed and some vague information about Buchholz's personality and criminal history.

Further, Petitioner has presented no evidence connecting Buchholz to the Michelbacher crimes, and the trial court ruled that his "confession" to the Baldwin homicide would not have been admissible. There is no probability of a different outcome, and Petitioner has not established that his trial counsel were ineffective.

Penalty Phase Claims

      1.    The Death Sentence for Kidnapping (Claim 17, ¶ 5)

Petitioner alleges that his counsel were ineffective in failing to argue on appeal that a death sentence for kidnapping violates the Eighth Amendment. Because a death sentence

**Memorandum Decision and Order - 67**

is not grossly disproportionate to the crime of kidnapping when the victim has been killed, Petitioner has not demonstrated a reasonable probability that this issue would have been a winning one.  He is not entitled to relief on this claim.

### 2. Failure to Challenge the HAC Aggravator (Claim 17, ¶ 13)

Petitioner next contends that his attorneys should have presented an issue on appeal challenging the heinous, atrocious, and cruel aggravating circumstance, then found in Idaho Code § 19-2515(g)(5), as unconstitutionally vague.

The Idaho Supreme Court placed a limiting construction on this aggravator in *State v. Osborn*, 631 P.2d 187 (Idaho 1981).  Petitioner has not argued how his counsel could have persuaded the Idaho Supreme Court to retreat from its position.  Additionally, the Ninth Circuit has found the *Osborn* construction sufficiently definite and narrow to stave off vagueness and overbreadth challenges.  *Leavitt v. Arave*, 383 F.3d 809, 836-37 (9th Cir. 2004).  Therefore, Petitioner has not shown either deficient performance or prejudice.

### 3. Investigation and Development of Mitigating Evidence (Claim 17, ¶¶ 2, 8, 9)

In three related subclaims, Petitioner alleges that his counsel were ineffective because they failed to investigate, develop, and present mitigating evidence during the penalty phase of the trial.

In this Court's May 18, 2006 Memorandum Decision, it determined that Petitioner had not supported these claims with specific factual allegations related to the type of mitigation case that he now believes his counsel should have prepared.  (Docket No. 246, pp. 8-9.)  In

**Memorandum Decision and Order - 68**

response, Petitioner lodged numerous documents, records, and other papers with the Court. (Docket Nos. 252-288.)  Little effort was made to winnow out relevant documents from irrelevant ones, or to otherwise connect the information in a coherent fashion for the Court. In Petitioner's Supplemental Merits Brief on Non-Dismissed Claims, he merely refers to this voluminous lodging without supplying legal argument.  (Docket No. 250, pp. 10-12.)

However, in a short memorandum introducing the factual proffer, Petitioner suggests that trial counsel were constitutionally ineffective because they failed to offer a complete picture of the allegedly dysfunctional aspects of Petitioner's social and family history, and because counsel failed to present expert mental health testimony.  (Docket No. 251.) Petitioner has also submitted an illustrative exhibit that purports to lay out his family tree with descriptive labels indicating drug abuse, mental illness, and criminal history.[11] (Docket No. 309.)  The Court has reviewed this material and concludes that the factual allegations, even if proven to be true, would not establish a Sixth Amendment violation under the *Strickland* standard, and this claim shall be denied without an evidentiary hearing.

By the time of Petitioner' sentencing hearing, defense counsel in a capital case had a duty to thoroughly investigate the defendant's character and background in anticipation of the penalty phase of the trial.  *See, e.g., Williams v. Taylor*, 529 U.S. 362, 396 (2000).  But because there are countless ways in which to represent a criminal defendant, trial counsel's decisions must be afforded a "heavy measure of deference," and "strategic decisions made

---

[11]  Petitioner has lodged this exhibit both in electronic format, Docket No. 309, and on posterboard.

**Memorandum Decision and Order - 69**

after a thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 691; *Wiggins v. Smith*, 539 U.S. 510, 524 (2003). Under this standard, the relevant inquiry is not whether counsel should have presented a certain type of mitigating evidence, but whether the investigation supporting counsel's decision not to introduce mitigating evidence was itself reasonable, measured under prevailing professional norms and after viewing the matter from counsel's perspective at the time. *Wiggins*, 539 U.S. at 523.

The present case is not one in which counsel wholly failed to conduct a mitigation investigation. To the contrary, although counsel did not retain a "mitigation specialist," they did hire an investigator to assist them in interviewing witnesses in preparation for the penalty phase. (Radin Depo., pp. 93-94, 99.) Counsel or their investigator spent "a lot of time" speaking to family members, and they had some contact with neighbors of the Rhoades family. (Hart Depo., pp. 63-64.) Before trial, counsel had consulted with a mental health expert about Petitioner's mental state.

At the sentencing hearing, twenty witnesses were called to testify about Petitioner's character, upbringing, social history, and work skills. Those witnesses focused on Petitioner's early childhood difficulties with polio, which left him with a lifelong limp and coordination problems, his dedication and skills as a sheetrocker, his gentle demeanor and helpfulness even while incarcerated, and the perceptions of various Rhoades family members that they had been persecuted and subject to ridicule within the community. (Tr. Vol. IX, pp. 2420-2532.) Witnesses described how Petitioner was protective of his female friends and

**Memorandum Decision and Order - 70**

family members, and they discussed his dependability as a babysitter.  At least some evidence of Petitioner's heavy drug use was before the court.  (Tr. Vol. IX, p. 2440, 2457.) During his closing argument, which covered nearly thirty pages of sentencing transcript, co-counsel John Radin argued that Petitioner's lack of a violent criminal history was a mitigating factor, as was lingering doubt about the extent of his role in the crimes.  (Tr. Vol. IX, pp. 2569-2596.)

Despite the mitigation case that was presented, Petitioner now contends that counsel were unreasonably deficient in not focusing more intensely on the darker aspects of his family background.  He also contends that counsel should have offered expert mental health testimony, particularly related to the effect that longstanding drug abuse would have had on his mental functioning.

Taking the mental health issue first, the expanded record shows that counsel were aware of the possibility that drug use may have affected Petitioner's mental state and his culpability.  (Hart Depo., pp. 40-41; Radin Depo, pp. 42-43, 57, 89.)  Before trial, counsel consulted with a psychiatrist, Dr. Kenneth Ash, about these and other matters.  (Hart Depo., p. 108.)  Counsel considered calling Dr. Ash as a witness at the sentencing phase, but they were "concerned about what Dr. Ash might or might not say under cross-examination and the extent to which he would hurt us versus help us."  (Radin Depo., pp. 89, 92-93.) Consistent with this decision, counsel also opposed the trial court's offer to have Petitioner evaluated for sentencing purposes by another board-certified psychiatrist.  (Radin Depo., p. 92.)  At least part of this opposition appears to have been based upon concerns about

**Memorandum Decision and Order - 71**

developing adverse evidence that could have been used in Petitioner's other pending murder cases.

This Court concludes that counsel exercised reasonable professional judgment in declining to present expert testimony related to the interaction of drug abuse and mental functioning, and Petitioner has failed to demonstrate unreasonably deficient performance for this aspect of his claim.  Co-counsel Stephen Hart's uneasiness with the decision in hindsight and several years after his client was sentenced to death, while candid, is not determinative of the issue.  (Hart Depo., pp. 99-102, 131.)

In any event, even if counsel's investigation into mental health issues or Petitioner's family history did fall below an objective standard of reasonableness, the Court alternatively concludes that Petitioner has not alleged facts that would demonstrate *Strickland* prejudice; that is, he has not shown that, but for counsel's alleged errors, there is a reasonable probability of a different sentencing outcome.   In assessing prejudice under these circumstances, the Court must reweigh the evidence in aggravation against the totality of the available mitigating evidence, including the mitigating evidence adduced in the federal habeas proceeding.  *Wiggins*, 539 U.S. at 534.  The aggravated nature of these crimes is simply too strong, and the new mitigating evidence adds too little, to create a reasonable probability of a different outcome.

On the aggravated side of the equation, the state court's central finding was that the crimes were especially heinous, atrocious, or cruel, manifesting exceptional depravity, as that phrase had been interpreted and limited by *State v. Osborn*, 631 P.2d 187 (Idaho 1981).

**Memorandum Decision and Order - 72**

Specifically, the court recounted how Petitioner picked a random victim, abducted her at gunpoint, forced her to withdraw a large amount of cash, and then raped her before shooting her nine times, leaving her to die alone in the desert. The court was troubled by Petitioner's deliberative act of reloading his weapon before firing several of these shots. The court further noted that Petitioner then "somehow mounted, straddled or laid himself on the face, shoulders, and chest of his victim, insert[ed] his penis in her mouth, and ejaculated." (R. Vol. III, p. 722.) As additional statutory aggravators, the court found that Petitioner's acts were accompanied by a specific intent to kill and that he had exhibited a propensity to commit murder in the future. Idaho Code § 19-2515(g)(7),(8) (1987). For kidnapping, the court also concluded that the victim had suffered grievous physical and mental injury because of the rape and other related abuse, and, obviously, that Petitioner had created a great risk of death to the victim. Idaho Code § 18-4505(6)(a),(b) (1987). There can be little doubt that the aggravating circumstances were amply supported by the facts in this case, and that the sentencing court found them to carry heavy weight.

On the other side of the balance, the court was already well aware of several mitigating circumstances that were individual to Petitioner, including his difficulties as a young child diagnosed with polio, which hampered his ability to fit in with his peers, and the perception by Petitioner's family that it had been ostracized by the community. The court also noted Petitioner's lack of a felony record, craftsmanship as a sheetrocker, cooperative nature with those close to him, kindness to children and animals, and good behavior while incarcerated. Additionally, the court found, as a mitigating factor, that "defendant has used

**Memorandum Decision and Order - 73**

alcohol and drugs to excess for several years preceding these charges." (R. III, p. 714-716.)

"[A] penalty phase ineffective assistance claim depends on the magnitude of the discrepancy between what counsel did investigate and present and what counsel could have investigated and presented." *Stankewitz v. Woodford*, 365 F.3d 706, 716 (9th Cir. 2004). The discrepancy in this case is not exceptionally wide, and the additional facts that Petitioner has proffered in this proceeding would not have created a critical mass of mitigating evidence that might have tipped the scales toward life. Much of the new information pertains to remote or extended family members, and its probative force would have been marginal. The Court recognizes that Petitioner is attempting to show a complete family history, going back several generations, but he has not explained how the rumored behavior of distant relatives has a casual or direct bearing on him.

Within his more immediate family, Petitioner has come forward with evidence that his father was an alcoholic with a relatively low IQ who had a criminal record and who attempted suicide at least once in the past. Petitioner has also submitted declarations indicating that his mother and father fought routinely, both verbally and physically, and that the children witnessed these fights. Clearly, poverty and substance abuse were prevalent throughout the family. (Docket No. 254, Exhibits 1-19.)

Notably absent, however, is any persuasive evidence that Petitioner was himself physically or violently abused as a child, abandoned, placed within the State's custody, or

**Memorandum Decision and Order - 74**

otherwise institutionalized.[12]  Petitioner has also provided no records showing that he has a documented history of emotional disturbances, mental illnesses, or organic brain disorders during his developmental years or later.  Indeed, a persistent theme running through many of the declarations from family and friends is that Petitioner was a gentle, caring, and likable person until he started abusing drugs.  (Docket No. 254, Exhibits 1-19.)  This assessment of his character is largely consistent with the information that was already in front of the state court at sentencing.

The declarations that Petitioner has submitted from two mental health experts do not conclusively fill in the blanks about his mental or emotional state, either now or at the relevant time.  Instead, they largely repeat the family history without providing firm conclusions.  For instance, Dr. Craig Beaver, a neuropsychologist, writes that "Paul Rhoades grew up in a family context that deprived him of normal development," and that chronic methamphetamine use "may have well have damaged his brain in areas critical to impulse control and the ability to think clearly in highly pressured situations," but he ultimately

---

[12] The proffer includes some claims of incest within the family, but earlier in this proceeding Petitioner asked the Court to delete these allegations from his Petition, a request that was granted.  (Docket No. 154, pp. 3-5, Docket No. 174, p. 5.)

Moreover, any sexual abuse seems to have involved primarily older male relatives and Petitioner's sisters, rather than Petitioner himself.  There may have been an inappropriate relationship between Petitioner and one of his sisters, and perhaps between Petitioner and a female aunt, but reports of the latter are based on second-hand information and it appears that this relationship, if it occurred, began when Petitioner was an adult.  (Docket No. 254, Exhibits 5, 9, 15, 17.)

Defense counsel have also since testified that they knew of some of these allegations, and that while they did not present the evidence directly to the trial court, the court was aware of the information, at least in a general sense.  (Hart Depo. pp. 106-07; Radin Depo., pp. 94-95, 147.)

concludes that "[f]urther neuropsychological testing has always been necessary to fully and adequately assess Paul Rhoades." (Docket No. 252, pp. 39-40.) Dr. Beaver reaches the conclusion that further neuropsychological testing is necessary despite the passage of twenty years since these crimes were committed.

Similarly, Dr. Pablo Stewart, a psychiatrist, admits that he has not conducted an evaluation of Petitioner, and he indicates that his opinion is a "limited" one based upon his review of selected records and Dr. Beaver's report. Although Dr. Stewart does list several possible diagnoses, including post-traumatic stress disorder, polysubstance abuse, mood disorder, cognitive disorder, substance induced mood disorder, substance induced psychotic disorder, he does not elaborate on these preliminary conclusions and qualifies even his limited opinion as a "working assessment." (Docket No. 253, p. 21.) Thus, even at this late juncture, Petitioner's emotional and mental makeup remains inconclusive.

Recent cases from the Supreme Court that have addressed the quality and strength of undiscovered mitigating evidence further guide and inform this Court's decision. An illustrative example is *Wiggins*, in which the sentencing jury did not hear that the defendant was frequently abandoned as a small child and forced to beg for food before he was placed in foster care, where he was repeatedly sexually assaulted. *Id*. at 534-35, 537. The Supreme Court found that counsel's failure to develop and present that evidence was prejudicial, given that only a "halfhearted" mitigation case was offered. *Id*. Likewise, in *Rompilla v. Beard*, 545 U.S. 374, 392 (2005), defense counsel failed to unearth a treasure trove of mitigating evidence indicating that the defendant, who suffered from organic brain damage, was beaten

**Memorandum Decision and Order - 76**

often by his alcoholic father and left in a wire mesh dog pen filled with excrement.  *See also Williams v. Taylor*, 529 U.S. 362, 370 (2000) (defendant was borderline mentally retarded and had suffered through a nightmarish childhood of deprivation and abuse); *Stankewitz v. Woodford*, 365 F.3d 706, 716 (9th Cir. 2004) (defendant was beaten by his alcoholic parents, became a ward of the state, was institutionalized and thereafter sexually abused).

While Petitioner's factual proffer may present a more complete family history of substance abuse, neglect, and general dysfunction, it simply does not depict the same "excruciating" life history that was found to exist in these other cases.  More importantly, in *Wiggins*, *Rompilla*, and *Williams*, the landscape that trial counsel had painted for the sentencing jury was barren, and the rich evidence that counsel failed to uncover would have added vivid color to that landscape.  Here, in contrast, trial counsel had already put on a fairly robust case for life.

Accordingly, given the strength of the aggravating circumstances in this case and the modest contribution that Petitioner's newly proffered facts, even if proven to be true and credible, would have added to the mitigation case that defense counsel had presented, there is no reasonably probability that the result of the sentencing proceeding would have been different.  This claim will be denied, and no evidentiary hearing is required.

### Claim 18:   The Presentence Investigation Interview

In *Estelle v. Smith*, 451 U.S. 454 (1981), the Supreme Court held that a defendant in a capital case has a Fifth Amendment privilege not to incriminate himself during an interview with a psychiatrist who will testify for the state at sentencing.  The Ninth Circuit has

**Memorandum Decision and Order - 77**

concluded that the reasoning in *Estelle* applies to an interview with a state official who is conducting a presentence investigation in anticipation of a capital sentencing proceeding. *Hoffman v. Arave*, 236 F.3d 523, 537-38 (9th Cir. 2001).   The Ninth Circuit further determined in *Hoffman* that a presentence interview in a capital case is a "critical stage" of the proceeding such that the defendant has the right to the assistance of counsel under the Sixth Amendment.  *Id*. at 539.

For his final claim, Petitioner  relies on *Estelle* and *Hoffman* to allege that his Fifth and Sixth Amendment rights when the trial court relied on statements that he had made during the presentence investigation interview.  Petitioner, however, made no statements during the interview that were used by the court in imposing the death penalty.  Although he did respond to some questions, those responses were on benign subjects that the court ultimately considered to be mitigating.  (P.S.I., p. 3.)  Moreover, as in *Hoffman*, Petitioner's Fifth Amendment claim is undercut by the fact that his attorneys actually advised him of his right to remain silent, and the record shows he understood what it meant.  *Id*. at 538.  With respect to the Sixth Amendment claim, there is no indication that Petitioner's counsel was prohibited from attending the interview, unlike *Hoffman*.

Finally, because Petitioner has not shown that any statements were relied upon by the state court to impose death sentences, he has not established that any error that may have occurred had a "'substantial and injurious influence or effect' on his sentence."  *Hoffman*, 236 F.3d at 540.

## V.

**Memorandum Decision and Order - 78**

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED that the Second Amended Petition for Writ of Habeas Corpus shall be DENIED.

IT IS FURTHER ORDERED that this cause of action shall be DISMISSED with prejudice.

DATED:  **March 28, 2007**

Honorable Edward J. Lodge
U. S. District Judge