**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

PAUL EZRA RHOADES,
              *Petitioner-Appellant*

                v.

JEFF HENRY, of the IMSI,
Department of Corrections State of
Idaho,*
              *Respondent-Appellee.*

No. 07-99023

D.C. No.
CV-93-00156-S-EJL
District of Idaho,
Boise

OPINION

Appeal from the United States District Court
for the District of Idaho
Edward J. Lodge, District Judge, Presiding

Argued and Submitted
February 3, 2010—Seattle, Washington

Filed March 8, 2010

Before: Pamela Ann Rymer, Ronald M. Gould and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Rymer

---

*Jeff Henry is substituted for his predecessor, Arvon J. Arave, Department of Corrections State of Idaho. Fed. R. App. P. 43(c)(2).

RHOADES v. HENRY (Michelbacher)                3567

---

**COUNSEL**

Oliver W. Loewy, Federal Defender Services of Idaho, Moscow, Idaho; Dennis A. Benjamin, Nevin, Benjamin, McKay & Bartlett, Boise, Idaho, for the petitioner-appellant.

L. LaMont Anderson, Deputy Attorney General, Boise, Idaho, for the respondent-appellee.

---

**OPINION**

RYMER, Circuit Judge:

Paul Ezra Rhoades appeals the district court's denial of his petition for writ of habeas corpus. He was convicted in Idaho state court of the 1987 first degree murder, first degree kidnapping, robbery, rape, and infamous crime against nature of Susan Michelbacher.[1] The trial court sentenced him to death

---

[1] Rhoades was separately convicted for the shooting deaths of Stacy Baldwin and Nolan Haddon, both of whom were killed with the same gun that killed Michelbacher during the same three-week period in February and March of 1987. He was sentenced to death for killing Baldwin and for kid-

on his convictions for first degree murder and first degree kid-
napping. The Idaho Supreme Court upheld his conviction,
sentence, and denial of post-conviction relief. *State v.
Rhoades* (Michelbacher), 822 P.2d 960 (Idaho 1991). We
affirm denial of relief on the conviction, and defer submission
on sentencing issues.[2]

## I

Susan Michelbacher was a junior high school teacher who
didn't feel well on the morning of March 19, 1987. Around
6:30 a.m. she decided to go to work to make lesson plans for
a substitute so she could return home and rest. She drove her
1984 Ford Econo Line van. She wasn't home when her hus-
band came back at noon, nor was she there when he returned

---

napping her, *see State v. Rhoades* (Baldwin), 820 P.2d 665 (Idaho 1991),
and received two indeterminate life sentences for the Haddon murder after
entering a conditional guilty plea, *see State v. Rhoades* (Haddon), 809
P.2d 455 (Idaho 1991). Appeals from denial of federal habeas relief in
both cases are also before us; we resolve them in separate opinions.
*Rhoades v. Henry* (Baldwin), No. 07-99022, slip op. (9th Cir. March 8,
2010); *Rhoades v. Henry* (Haddon), No. 07-35808, slip op. (9th Cir.
March 8, 2010).

[2]Rhoades filed successive post-conviction petitions in state court while
his federal proceedings were ongoing. One of these petitions is still pend-
ing in the Idaho Supreme Court. In it, Rhoades claims that he was entitled
to jury sentencing based on *Ring v. Arizona*, 536 U.S. 584 (2002). The
trial court denied this petition based upon *Schriro v. Summerlin*, 542 U.S.
348 (2004), which held that *Ring* is not retroactive to cases on collateral
review. The Idaho Supreme Court dismissed Rhoades's appeal, but the
United States Supreme Court granted certiorari, vacated and remanded the
case for further consideration in light of *Danforth v. Minnesota*, 552 U.S.
264 (2008). *Rhoades v. Idaho*, 128 S. Ct. 1441 (2008) (mem.). *Danforth*
indicated that states may themselves decide to apply *Ring* retroactively to
state post-conviction proceedings. 552 U.S. at 266.

In light of the fact that this petition is still pending in the Idaho Supreme
Court, there is a possibility that Rhoades's sentence could be vacated. As
both parties agreed at oral argument, it is prudent to defer reaching issues
pertaining to the penalty phase until the Idaho Supreme Court has spoken.
Therefore, we address only guilt phase issues in this opinion.

at 5:30. He called the school and found out that Michelbacher had been in earlier to do her lesson plan but had not been at school during the day.

Meanwhile, around 7:30 a.m., Valerie Stapf nearly had a head-on collision in a parking lot with someone driving a van that looked exactly like Michelbacher's. Stapf identified Rhoades as the passenger. She thought the driver was similar in appearance to Michelbacher, but could not make a positive identification. After a short standoff, the van backed up and went toward the First Interstate Bank.

Michelbacher pulled her van to the drive-in window just as the bank opened at 8:30 a.m. She gave the teller a check for $1000, which the teller cashed. Ten to fifteen minutes later, Michelbacher cashed another $1000 check at another of the bank's branches.

Around 10:00 a.m., Susan Browning saw Michelbacher's van enter her driveway and stall while backing out. Browning identified Rhoades as the driver, Harry Burke as one passenger, and Rhoades's sister as another. Michelbacher's body was subsequently discovered less than a mile away.

Later in the day, two other people saw Rhoades, or someone who looked like Rhoades, in Michelbacher's van. The van was found the next day in the parking lot of the bank where the first $1000 check was cashed. It had fresh scratches, a smashed tailpipe, and 200 more miles on it than when Michelbacher left home the morning before.

Michelbacher's body was found on March 21 in a remote, rural area. An autopsy revealed that she had been raped, she had been shot nine times — once while standing and the remaining times while lying down — and her attacker had ejaculated into her mouth when she was either almost dead or already dead. Rhoades could not be excluded as the semen donor, nor could he be ruled out as the source of head hair

retrieved from Michelbacher's body and van or of pubic hair retrieved from her body.

The next day Rhoades showed Vicky Miller a roll of cash and told her that "he had come into some money" and was going to the Jackpot Casino. Later that evening, Rhoades was seen in a Ford LTD with a large amount of cash at a gas station between Idaho Falls and the Jackpot Casino. He told the cashier he was going to Nevada.

On March 24, a Nevada state trooper noticed that a green Ford had been wrecked in the median of the highway about twenty miles outside Wells, Nevada. A truck driver saw Rhoades get out of the car and fumble with something brown. When the trooper was able to respond twenty minutes later, he ran the plates and found out that the car had been reported stolen by Pauline Rhoades, Rhoades's mother. The trooper also found a .38 caliber revolver lying outside the driver's door. The gun was loaded with special lead bullets. Ballistics testing would show that this gun was used to fire the bullets that killed Michelbacher. Rhoades's fingerprints were also lifted from the LTD.

Wells police officers learned that Rhoades was at the 4 Way Casino about 9:00 p.m. the next evening. Rhoades was arrested at a blackjack table, handcuffed, and placed across the trunk of the police car. While being arrested, Rhoades said he "wanted the money that was on the game."

Meanwhile, Idaho police officers (who had gone to Nevada after being alerted to discovery of the stolen car belonging to Rhoades's mother) were contacted and they, too, went to the casino. As the Idaho team approached, Rhoades, who knew one of them, spontaneously said "I did it." Immediately after this, Officer Victor Rodriguez, from Idaho, advised Rhoades of his Miranda rights.[3] Rhoades was asked if he understood

---

[3]*Miranda v. Arizona*, 384 U.S. 436 (1966) (requiring that the police inform a person that he has a right to remain silent and the right to an attorney before custodial interrogation).

those rights and said something to the effect of "I do, yes." Detective Dennis Shaw, also from Idaho, searched Rhoades and found a ten dollar bill, a one dollar bill, and a one-hundred dollar bill. To test Rhoades's awareness, Shaw told Rhoades he had found three dollars. Rhoades responded: "There'd better be a hundred and eleven dollars there."

Rhoades was then taken to the Wells Highway Patrol substation. While taking photographs at the station, Shaw said something like "If I arrested you earlier, maybe the victim would be alive today." Rhoades responded: "I did it." Shaw followed that statement by saying "the lady in Idaho Falls," to which Rhoades again replied, "I did it."[4]

## II

The state charged Rhoades with first degree murder, first degree kidnapping, robbery, rape, and infamous crime against nature. The information also charged Rhoades with the first degree murder of Nolan Haddon, but the Haddon charges were later severed. Rhoades moved to suppress his "I did it" statements. After an evidentiary hearing, the trial court denied the motion.

The jury found Rhoades guilty on all counts. The trial court then held a sentencing hearing. It concluded that the mitigating factors did not outweigh any one of the statutory aggravating circumstances that it found. Accordingly, the judge sentenced Rhoades to death for first degree murder and for first degree kidnapping. It imposed fixed life prison sentences for the remaining crimes.

---

[4]Shaw actually referred to all three murders, saying something along the lines of "If I had arrested you earlier, three people would be alive" followed by "The girl in Blackfoot and the two people in Idaho Falls." However, to avoid prejudice the parties stipulated that reference would only be made at trial to one murder in Idaho Falls (Michelbacher). For convenience, we will refer to the "I did it" statements made inside the station as a single statement, the "second statement."

Rhoades filed a petition for post-conviction relief. The trial court held an evidentiary hearing, after which it denied relief. The Idaho Supreme Court affirmed Rhoades's conviction, sentence, and denial of post-conviction relief on February 13, 1991. The Supreme Court denied Rhoades's petition for a writ of certiorari.

Rhoades filed his initial federal petition on February 21, 1994. As this was before the effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA), this appeal (except for procedural requirements for seeking review) is governed by pre-AEDPA law. *Sims v. Brown*, 425 F.3d 560, 562 (9th Cir. 2005).

The district court allowed Rhoades leave to develop the facts by taking the deposition of several witnesses, including his trial counsel, John Radin and Stephen Hart. Both attorneys also submitted affidavits on their handling of suppression issues. The court expanded the existing record to include the deposition transcripts and affidavits pursuant to Rule 7 of the Rules Governing Section 2254 Cases. After receiving supplemental briefing that included a factual proffer, the court denied an evidentiary hearing on Rhoades's claims for ineffective assistance of counsel,[5] and held that no other claims required one. In particular, the district court held that the state court had afforded Rhoades a full and fair hearing on his claims that the state had withheld material exculpatory information with respect to a third-party confession, and that his "I did it" statements should have been suppressed. The district court then denied those claims it had not previously dis-

---

[5]The court previously dismissed Rhoades's claims of ineffective assistance of trial counsel for procedural default, but changed its ruling in light of our decision in *Hoffman v. Arave*, 236 F.3d 523 (9th Cir. 2001). In *Hoffman*, we held that Idaho's forty-two day limit for seeking post-conviction relief during which no new counsel was appointed frustrated the right to raise claims of ineffective assistance in state court. Accordingly, the district court allowed Rhoades to proceed on his ineffective assistance claims.

missed, as well as Rhoades's motion to alter or amend and to reconsider the procedural default order.

Rhoades timely appealed issues on which he received a certificate of appealability, and one on which he did not.

## III

We review *de novo* the district court's decision to grant or deny a petition for writ of habeas corpus. *Martinez-Villareal v. Lewis*, 80 F.3d 1301, 1305 (9th Cir. 1996). "Ineffective assistance of counsel claims are mixed questions of law and fact which we review *de novo*." *Beardslee v. Woodford*, 358 F.3d 560, 569 (9th Cir. 2004).

"To the extent it is necessary to review findings of fact made in the district court, the clearly erroneous standard applies." *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002). This clear error review is "significantly deferential" and the court "must accept the district court's factual findings absent a 'definite and firm conviction that a mistake has been committed.' " *Id.* (citation omitted). Further, "[a]lthough less deference to state court factual findings is required under the pre-AEDPA law which governs this case, such factual findings are nonetheless entitled to a presumption of correctness unless they are 'not fairly supported by the record.' " *Id.* (citations omitted).

"A district court['s] denial of an evidentiary hearing is reviewed for abuse of discretion." *Beardslee*, 358 F.3d at 573.

## IV

Rhoades argues that the state violated his right to due process by withholding the fact that he had invoked his right to silence before being interrogated at the station and making the second "I did it" statement. He also asserts that the district

court abused its discretion by failing to grant an evidentiary hearing on this issue.

This claim arises out of a report by Detective Shaw that was produced at Shaw's deposition during federal habeas proceedings. Shaw wrote in the report:

> On the way to the police station I continued to talk with him [Rhoades]. He was very uncomfortable as he was so large and the car did not give him much room. I told him I was disappointed in him and he had lied to me about the burglary. I had tried to believe him and give him a chance but he had lied and conned me. I said we need to talk about it now so that you can get it off your chest. He said, "Aw bullshit, I don't want to talk about it.[ ] Get these fuckin cuffs off me."

Shaw explained during the deposition that he was talking about a burglary at Lavaunda's Lingerie because he wanted to start chronologically and that's where his warrant was. (Rhoades was a suspect in several burglaries, including a burglary at Lavaunda's Lingerie for which Shaw had obtained an arrest warrant.) Shaw assumed that Rhoades didn't want to talk about it because he was cramped. Shaw removed the handcuffs once inside the station.

The state counters that we may not address this argument because no such claim was made in Rhoades's first amended petition. Although he did raise a claim regarding the "I did it" statements, it was in the context that his Fifth, Sixth and Fourteenth Amendment rights were violated by admission of ambiguous and unreliable statements. Thus, the state contends, a *Brady*[6] claim based on Shaw's discussion with Rhoades en route from the 4 Way Casino to the station is

---

[6]*Brady v. Maryland*, 373 U.S. 83 (1963) (imposing duty on the prosecution to disclose material evidence favorable to an accused).

waived. Rhoades responds that this argument is not waived because he used the "I don't want to talk about it" statement to support his claim that the second "I did it" statement should have been suppressed.**⁷**

**[1]** The state is correct that no *Brady* claim arising out of the "I don't want to talk about it" statement was presented in district court. The amended petition makes no such claim. So far as we can tell, the only *Brady* issues that were raised involved the confession of Kevin Buchholz and impeachment material on Susan Browning, a witness for the state. The district court did discuss the "I don't want to talk about it" statement in the context of addressing Rhoades's argument that his *Miranda* rights were violated by admission of the second "I did it" statement. In that context, the court held that the statement involved an unrelated burglary and did not, in any event, constitute a clear and unambiguous invocation of the right to stop all conversation. The court did not discuss whether the state had withheld information about the "I don't want to talk about it" statement in violation of *Brady*. In these circumstances the claim is waived. It is not enough for a potential claim to lurk within an actual claim. The question of whether the state withheld material, exculpatory information contrary to its duty of disclosure is quite different from whether the statement itself invoked a right to silence. We cannot expect district courts to be that clairvoyant. Nor should this court be making decisions on claims that have not been developed in district court, especially a claim that is fact-driven as this one

---

**⁷**We have discretion to review newly presented issues if "(1) there are 'exceptional circumstances' why the issue was not raised in the trial court, (2) the new issue arises while the appeal is pending because of a change in the law, or (3) the issue presented is purely one of law and the opposing party will suffer no prejudice as a result of the failure to raise the issue in the trial court. Further exception may be made when plain error has occurred and an injustice might otherwise result." *United States v. Flores-Montano*, 424 F.3d 1044, 1047 (9th Cir. 2005) (quoting *United States v. Flores-Payon*, 942 F.2d 556, 558 (9th Cir. 1991)). Rhoades does not argue that any exception applies.

is. As we have often said, "a party cannot treat the district court as a mere ill-placed bunker to be circumvented on his way to this court where he will actually engage his opponents." *Handa v. Clark*, 401 F.3d 1129, 1132 (9th Cir. 2005) (citing *Crawford v. Lungren*, 96 F.3d 380, 389 n.6 (9th Cir. 1996)).

**[2]** Even were a *Brady* claim preserved, it would fail. As we explained in *Rhoades v. Henry* (Baldwin), no *Brady* violation occurs when a defendant possessed the information that he claims was withheld. Slip op. at 3530-31. Rhoades made the "I don't want to talk about it" statement himself, and failed to show that his counsel were unaware of the salient facts. *See Rhoades* (Haddon), slip op. at 3524-28 (holding that the salient facts were known to Rhoades's counsel in the Haddon case, who also represented Rhoades in the Michelbacher case). Nor does Rhoades advance any argument why the court abused its discretion in not holding an evidentiary hearing. Accordingly, we find none.

V

A

Rhoades raises two related issues arising out of Kevin Buchholz's confession to the Baldwin murder: that the state withheld the confession as well as other facts relating to it in violation of *Brady*; and that trial counsel was ineffective in failing to investigate Buchholz's confession. He adds with respect to both that the district court should have held an evidentiary hearing.

Officer Joseph Love arrested Buchholz on March 14, 1987, at his parents' home after Buchholz's father called police to report a fight. Buchholz was quite drunk. He told Officer Larry Christian, on duty at the jail, that he shot the girl from the Mini Barn (Stacy Baldwin). Christian reported the conversation to his supervisor, then returned to talk to Buchholz.

Buchholz said he had shot the girl from the Mini Barn twice in the back, had shot several times around the body, and had emptied the gun. Buchholz recanted the confession once sober, explaining that he was with his family the night of the murder. Family members confirmed this. Neither Buchholz's fingerprints, hair sample, nor shoe prints matched anything connected to the crime.

Love wrote a report, which indicated that Buchholz said "he was the one who killed the girl at the Mini Barn. Why don't you just pin it on me. I did it." Christian also wrote a report, which reflected that Buchholz told him he had fired several shots and hit the girl from the Mini Barn twice in the back with a .38 or a 9mm. Detective Newbold prepared a report summarizing the Christian report. Only Newbold's report was turned over. Stephen Hart, one of Rhoades's attorneys, testified at an evidentiary hearing that the Newbold report had been produced, and Buchholz testified that he fabricated the confession because he was intoxicated and angry at being arrested on what he thought were bogus charges.

[3] The trial court denied post-conviction relief on Rhoades's *Brady* claim, noting that he had vigorously opposed admission of evidence about the Baldwin matter. It held that the confession was inadmissible because it was irrelevant to the Michelbacher matter. The Idaho Supreme Court affirmed, concluding that with the Newbold report in hand, the defense could have conducted further inquiry had it wanted to. *Rhoades I* (Michelbacher), 822 P.2d at 972. The district court noted that the Buchholz material in the main relates entirely to the Baldwin homicide,[8] not the Michelbacher case, and that the state trial court ruled that it would not be received in the Michelbacher trial. For this reason there is

---

[8]The only arguable exception is a polygraph examination given to Buchholz. However, as we explained in the Baldwin case, polygraph results are not admissible in Idaho. *See Rhoades* (Baldwin), slip op. at 3524 n.6.

no prejudice and no possibility of a different outcome. Regardless, the district court held that the essential facts that comprise the allegedly exculpatory information were in the Newbold report, so no *Brady* violation occurred. We agree on both grounds. *See Rhoades* (Baldwin), slip op. at 3531-34.

**[4]** It follows that Rhoades's ineffective assistance claim fails as well. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984) (petitioner must show prejudice as well as deficient performance). *See Rhoades* (Baldwin), slip op. at 3527-28.

**[5]** Finally, Rhoades offers no support for his assertion that the district court should have held an evidentiary hearing. We review denial of an evidentiary hearing for abuse of discretion, *see Baja v. Ducharme*, 187 F.3d 1075, 1077 (9th Cir. 1999), and see none.

B

Rhoades's second *Brady* claim goes to withholding of facts that he believes could have impeached Susan Browning. Browning was one of two witnesses who testified to seeing Rhoades in the Michelbacher van the morning that Michelbacher was killed. Browning was involved in two incidents about which Rhoades's counsel learned in post-conviction proceedings. The first occurred the day before the preliminary hearing: Browning called a Bonneville County Deputy Sheriff to tell him that she was just passed on the road by a dirty-looking green Jeep and the side window of her car exploded inward. She thought it was from a gunshot, though no bullets were ever found, and that it may have been related to her status in the Michelbacher case. In Rhoades's view this was a delusional encounter that would have impeached Browning's credibility and shown bias on her part as a result of fear. The second incident happened about a year later, after the trial, when her back windshield was destroyed. She felt it may also have been caused by a gun shot. Rhoades suggests this incident underscores the unreliability of Browning's trial testi-

mony because it shows her willingness to draw conclusions that lack support.

The district court found Browning's experiences extremely tangential to the case but, even if Rhoades had demonstrated how he could have used either of them as impeachment, he had not shown prejudice given the compelling evidence of guilt. The court first reviewed the key evidence: The murder weapon that fired the bullets that killed Michelbacher was found near the car Rhoades had just abandoned on a roadside in Nevada, and .38 caliber ammunition like that used in the murder was retrieved from inside the vehicle; a witness had seen Rhoades with a similar handgun and he had purchased .38 caliber ammunition like that found in the car a few days before Michelbacher was murdered; Michelbacher withdrew $2000 on the morning of her death, and Rhoades had a significant amount of cash after the murder; he was seen in the Michelbacher van and long hairs consistent with his were found inside that van; a pubic hair consistent with his was on the victim's body and serological tests showed that he fell within a small percentage of the population that could not be excluded as a potential semen donor while the other passenger seen in the car, and Michelbacher's husband, had been excluded; and when told that Michelbacher's death may have been avoided had he been arrested sooner, Rhoades said "I did it." Applying the *Kyles*[9] standard, and including the undisclosed information in the analysis, the court determined that nothing about the picture would have changed in Rhoades's favor had the state turned over all the material. The prosecution would have been able to show that the Buchholz confession was unreliable and probably false, *see Rhoades*

---

[9]*Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (instructing that for purposes of materiality in the *Brady* inquiry and prejudice, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence").

(Baldwin), slip op. at 3525-27, 3533-34, and Browning's credibility had already been seriously challenged during cross-examination at trial. Among other things, cross-examination brought out that Browning claimed she could see the brand of jeans Rhoades was wearing when he was sitting in the driver's seat of the van, despite the fact that the door blocked her line of sight. Counsel also elicited from Browning that she changed her story about when she saw the van, and what she saw in it. Thus, the court concluded, Rhoades failed to show a reasonable probability that the result of the trial would have been different.

**[6]** We agree with the district court. *See Williams v. Woodford*, 384 F.3d 567, 599 (9th Cir. 2004) (holding that there was no prejudice when the cumulative impeachment evidence would not have placed the witness "in a significantly worse light" and therefore, the result of the proceedings would not have been different). We realize that Browning did place Rhoades in the van near the time and location of the murder, but her testimony was not central to the prosecution's case in the same way that a key witness's testimony was in *Horton v. Mayle*, for example, upon which Rhoades relies. *See* 408 F.3d 570 (9th Cir. 2005). In *Horton*, the witness for whom impeachment material had not been disclosed testified that the defendant confessed to him; in the context of that case, this witness's testimony "was the glue that held the prosecution's case together." *Id.* at 579. Browning's testimony was nowhere near the glue level in this case; it provided one or two facts among many that connected Rhoades to the Michelbacher murder.

**[7]** Having considered the undisclosed evidence collectively, as courts are obliged to do under *Kyles*, we conclude that the trial "result[ed] in a verdict worthy of confidence." 514 U.S. at 434. As a result, there is no prejudice and therefore, no *Brady* violation.

Rhoades mentions an evidentiary hearing only in the caption and develops no argument at all with respect to the point. We take it as abandoned.

## VI

Rhoades claims that trial counsel rendered ineffective assistance by failing effectively to impeach the prosecution's forensic expert and by failing to counter the serological evidence. As well, Rhoades asserts the district court abused its discretion in denying an evidentiary hearing on this claim.

The state's expert, Donald Wyckoff, testified at trial that he performed a series of serological tests on semen found on Michelbacher's sweatpants and body, including ABO blood typing, secretor status, and PGM typing.[10] Based on these tests, Wyckoff excluded Harry Burke (one of the passengers seen in Michelbacher's van on the morning of the murder) and Albert Michelbacher (Michelbacher's husband), but could not exclude Rhoades as a semen donor.[11] Rhoades's blood type and secretor status put him within 32% of the population who could have been a contributor. The state's testing arrived at a PGM category of 1; Susan Michelbacher, Rhoades, and Burke were all within this general category, while Albert Michelbacher was 2,1. This correlation together with being an A Secretor put Rhoades within 16% of the population who could potentially have donated the semen.

---

[10]PGM, or phosphoglucomutase, is an enzyme marker found in blood, vaginal secretions, semen, and other bodily fluids.

[11]The sample deposit was by an A secretor, meaning someone with blood type A who is a secretor. The state's testing showed that Susan Michelbacher was blood type O, Rhoades is blood type A, Albert Michelbacher is blood type A, and Harry Burke is blood type O. Susan Michelbacher was a nonsecretor (NS), as is Albert Michelbacher; Rhoades is a secretor (S), as is Burke. Thus, only Rhoades and Burke are secretors, but Burke is blood type O, leaving only Rhoades as an A secretor.

Before trial, the state's forensic lab had also sent the swab samples to an FBI lab for more specific PGM subtyping. This testing revealed that one of the samples was "PGMsub 1+," which corresponded with Michelbacher's more specific PGM subtype (1+) but not with Rhoades's (1-1+), Albert Michelbacher's (2,1), or Burke's (1). Neither the state, nor the defense, went into the FBI's finding that the sample's PGM subtype did not match Rhoades's.

Rhoades had retained an expert for trial, Richard Fox, to evaluate fluid evidence, seminal fluid, and blood (as well as ballistics). The record is silent as to whether Fox discussed the FBI results with Rhoades's counsel. However, John Radin explained at his deposition in the federal proceeding that counsel chose not to put Fox on because he helped in one area but hurt in others.

During federal proceedings in 2005, Rhoades retained another expert, Dr. Greg Hampikian. Hampikian submitted an affidavit in which he opined that the FBI lab's 1987 report absolutely excludes Rhoades as a contributor of the semen. However, it turned out that Hampikian's affidavit mistakenly referred to the swab's subtyping as "sub 1-" instead of "sub 1+." Having reviewed it, the district court also suggested that the FBI's subtyping result could be explained as reflecting the victim's own biological contribution. Hampikian then submitted another affidavit correcting the mistake and indicating that it had no bearing on his conclusion. He also offered his view that regardless of which of the two possible explanations for the results was correct (if the result was based on semen, then Rhoades was excluded because he wasn't a match, or if the test result reflected the victim's own tissue, then Rhoades would be eliminated as the source of the PGM), Rhoades was still excluded as the contributor of the PGM. The district court found that Rhoades failed to show how an opinion similar to Hampikian's would have materially assisted the defense at trial. In its view, trial counsel could not have argued that the report exonerated Rhoades because there is no way of know-

ing whether it was the victim's own tissue sample on the swab that accounted for the result, and counsel covered this possibility during cross-examination of Wyckoff. As such, the district court found no deficiency. Alternatively, the court found that Rhoades had shown no prejudice, given that Rhoades's blood type and secretor status still placed him with 32% of the population that could have deposited the semen, and the other evidence of guilt was strong — ballistics and hair analysis linking Rhoades to Michelbacher, the "I did it" statement, his possession of the murder weapon, eyewitness accounts placing Rhoades in the van, and his unexplained windfall of cash immediately after the homicide.

**[8]** Whether or not Rhoades's counsel made an informed strategic choice, Rhoades has not shown prejudice given that his blood type A, and secretor status S, place him within 32% of the population that could have deposited the semen. Both markers eliminate Michelbacher's husband and Harry Burke without regard to PGM subtyping.[12] Factoring in the FBI's PGM subtyping results would have been marginally helpful to Rhoades, in that the prosecution could only have argued he was within 32%, not 16%, of the population who potentially could have donated the semen. But the results do not exclude Rhoades as a semen donor, just as a donor of the PGM 1+ found on the sample. Michelbacher was a 1+ and could have contributed the enzyme — something that was brought out on cross-examination even with respect to the more general testing done by the state. Further, the state's expert never expressed an opinion at trial that Rhoades was *the* donor, just that he could *not be excluded*. Nothing in Hampikian's affidavit changes that opinion. Nor was serological evidence central

---

[12]It was in this context that the prosecutor argued in closing that only Rhoades of the persons who had access matches, and that the semen samples in the vagina and in the mouth match Rhoades and match each other. That Rhoades's PGM subtype is not present on the sample tested by the FBI lab does not make this point more or less true, given that he was not excluded as the *semen* donor with or without the subtyping results.

to the prosecution's case. Certainly it was helpful to say that Rhoades was not excluded, but whether it was as part of 32% or 16% of the population was by no means the linchpin of the case. *Cf. Richter v. Hickman*, 578 F.3d 944, 963-68 (9th Cir. 2009) (en banc) (concluding that testing of a particular blood pattern was critical, thus the lack of it was prejudicial). By the same token, the government's case had no "substantial weaknesses" that would render it highly likely that testimony about the FBI results "would determine the outcome." *Cf. id.* at 964. Indeed, as the district court noted, evidence of guilt in this case is quite strong. Ballistics testing matched the gun and bullets linked to Rhoades to the murder; hairs (both head and pubic) consistent with his were found on Michelbacher; he said "I did it"; eyewitnesses placed him in Michelbacher's van; he was seen in that van near the spot where Michelbacher's body was found; Michelbacher withdrew $2000 in cash with Rhoades in the van, and afterwards he was seen with a lot of cash that was never explained.

## VII

Rhoades contends that the trial court's reasonable doubt instructions violated due process under *In re Winship*, 397 U.S. 358 (1970), and *Cage v. Louisiana*, 498 U.S. 39 (1990). In particular, the court used the phrases "moral evidence" and "moral certainty" in Instructions 23 and 26,[13] andindicated

---

[13]Instruction 23 stated:

A defendant in a criminal action is presumed to be innocent until the contrary is proved and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to an acquittal. This presumption places upon the State the burden of proving him guilty beyond a reasonable doubt.

Reasonable doubt is defined as follows. It is not a mere possible doubt because everything relating to human affairs and depending on moral evidence is open to some possible or imaginary doubt. It is that state of the case which after the entire comparison and consideration of all of the evidence leaves the minds of the

that the burden of proof is not intended to aid anyone who is in fact guilty in Instruction 22.[14]

   **[9]** Rhoades submits that Instructions 23 and 26 run afoul of *Cage* and *Victor v. Nebraska*, 511 U.S. 1 (1994), because of their reference to "moral evidence" and "moral certainty." He suggests that the jury could have read the "moral certainty" language to refer to the ethics or morality of the alleged

---

   jurors in that condition that they cannot say they have an abiding conviction to a moral certainty of the truth of the charge.

   A reasonable doubt is an actual doubt based upon evidence or lack of evidence. It is such doubt as you are conscious of after going over in your minds the entire case and giving consideration to all the testimony. If you feel uncertain and not fully convinced that the defendant is guilty or if you feel that you would not be acting reasonably should you find him guilty, and if you believe that a reasonable man in any matter of like importance in his own affairs would hesitate to act because of such doubt as you are conscious of having, then that is a reasonable doubt, and the defendant is entitled to the benefit of it.

   But if, after considering all the evidence, you have an abiding conviction of the truth of the charge, then you are convinced beyond a reasonable doubt, and you should render your verdict accordingly.

Instruction 26 stated:

   The law does not require demonstration or that degree of proof which, excluding all possibility of error, produces absolute certainty for such degree of proof is rarely possible. Moral certainty only is required, which is that degree of proof which produces conviction in an unprejudiced mind.

[14]Instruction 22 stated:

   The rule of law which clothes every person accused of a crime with the presumption of innocence and imposes upon the state the burden of proving his guilt beyond a reasonable doubt is not intended to aid anyone who is in fact guilt [sic] to escape but is a humane provision of the law intended so far as human agencies can to guard against the danger of an innocent person being unjustly punished.

offense, thus diminishing the state's burden of proving each element beyond a reasonable doubt. However, the question is not, as Rhoades puts it, whether the jury *could have* read the instruction as he posits, but whether "there is a reasonable likelihood" that it *did*. *Victor*, 511 U.S. at 6. We considered an instruction identical to Instruction 23 in the Baldwin case, and rejected the same arguments there that Rhoades makes here. *See Rhoades* (Baldwin), slip op. at 3538-40. As we pointed out in the Baldwin case, the Court in *Victor* directly addressed, and upheld, the constitutionality of a reasonable doubt instruction that had both phrases and was virtually identical to Instruction 23. Also, we previously found nothing constitutionally infirm in the same instruction. *Leavitt v. Arave*, 383 F.3d 809, 822 (9th Cir. 2004). In addition, the trial court in this case (as in *Victor* and in the Baldwin case) gave other instructions that made clear to jurors that they could only base a decision on evidence received in the trial, that Rhoades was presumed innocent unless and until proved guilty beyond a reasonable doubt, that the state had to prove every material allegation in the charge beyond a reasonable doubt before Rhoades could be convicted of any crime, and that if the jury entertained a reasonable doubt of the truth of any of these allegations it was their duty to give the defendant the benefit of the doubt and acquit.

**[10]** Rhoades argues that the "in fact guilty" language in Instruction 22 told the jury to consider actual guilt, or guilt in fact, rather than whether proof beyond a reasonable doubt, or legal guilt, has been established. He notes that similar instructions have been held erroneous, including by our court in *Reynolds v. United States*, 238 F.2d 460 (9th Cir. 1956). As it did in the Baldwin case, the state asserts that this challenge is *Teague*-barred.[15] *Teague* having been raised, we must consider it first. *Caspari v. Bohlen*, 510 U.S. 383, 389 (1994). As

---

[15] *Teague v. Lane*, 489 U.S. 288 (1989) (precluding retroactive application of a new rule on collateral review unless exceptions, not invoked here, are satisfied).

we held in the Baldwin case, *Teague* is not applicable. Rhoades's conviction in this case, as in the Baldwin case, became final after the Supreme Court rendered its opinion in *Cage*. Even if Rhoades were correct, which we think he is not, the rule he advocates would flow from *Cage* and thus its application would not be retroactive. *Rhoades* (Baldwin), slip op. at 3540-42.

**[11]** On the merits, Rhoades makes the same arguments in this case as he did in the Baldwin case with respect to an identical instruction, and they fail here for the same reasons they did there. *See id.* at 3542-43. In short, we disapprove of the instruction, but conclude it is not reasonably likely that Instruction 22, in context of the instructions overall, caused the jury to misapply the state's burden of proof.

Rhoades argues that the surrounding instructions do not cure the erroneous explanation of the presumption of innocence in Instruction 22. We disagree. Instructions 2 and 23 explicitly informed the jury that Rhoades was to be presumed innocent unless and until proven guilty beyond a reasonable doubt. Instruction 23 further noted that he began the trial with a clean slate with no evidence against him. And it provided a definition for reasonable doubt that the Supreme Court embraced in *Victor*. 511 U.S. at 20-21. Instructions 20 and 23 imposed the burden on the government to prove every material allegation for each crime beyond a reasonable doubt. The jury was admonished that it must base its decision solely upon the evidence presented in court, not on any other consideration. Read together, the instructions made clear that the presumption of innocence and the reasonable doubt standard must be applied in Rhoades's case.

**[12]** Given the entire set of instructions, we conclude that there is no reasonable probability that the jury convicted Rhoades ignoring the presumption of innocence or using a standard of proof lower than beyond a reasonable doubt.

## VIII

Rhoades faults the prosecutor for statements during closing argument that, in his view, amounted to an impermissible comment on Rhoades's right to remain silent. Rhoades did not testify, but he did call witnesses in his own behalf. Two were put on the stand to account for the large sum of money that Rhoades was seen with after Michelbacher's murder. One testified that he paid Rhoades's father $1500 for snow removal. While discussing Rhoades's statement to another witness, Vicky Miller, that he had "come into some money," the prosecutor said:

> When I get paid, when you get paid, is that how you describe it that you came into some money? That's the phrase you use when you inherit some money or come into some other windfall. In today's world when money changes hands legitimately there's generally a document that documents that transaction. A receipt, a check, a passbook savings account that indicates the transfer of those funds.
>
> What did we hear from the defendant yesterday?
>
> [DEFENSE COUNSEL]: Excuse me, Your Honor —
>
> [PROSECUTOR]: I'm sorry —
>
> [DEFENSE COUNSEL]: I'm going to object.
>
> [PROSECUTOR]: I'm sorry, what did we hear from the defense counsel in the case-in-chief yesterday? We heard the defendant's uncle take the stand and say, "Well, I've hired him on occasion to plow snow." Mr. Hart asked him, "In January or February did you pay him anything?" "Well, yeah that was a down year, I paid his father fifteen hundred dollars."

> Not a word, not one word, and no sentence about the
> month of February. The weekend of the 20th, 18th,
> 19th, 20th. Not one word.

Rhoades's request for a mistrial based on this statement
was denied. The trial court found that the prosecutor simply
misspoke and meant to say "defense." The court expressly
found no intentional overzealous comment; further, it
observed, the state is entitled to analyze the defense's evi-
dence, and to analyze the balance of the evidence. Thus, it
also found no problem with argument about evidence that the
defense had failed to explain. The trial court offered to give
a limiting instruction, but Rhoades declined. Rhoades's later
motion for a new trial based on the prosecutor's comment was
also denied. The court found that each juror had been advised
that the defendant did not have to testify; the comment was
immediately corrected, the prosecutor apologized, and argu-
ment resumed with reference to the defense counsel's case-in-
chief from the day before; the instructions admonished the
jury that it could not consider the fact that Rhoades did not
testify; the statement was not intended to be, and was not of
such a character that the jury would naturally and necessarily
take it to be, a comment on the failure of the accused to tes-
tify; and Rhoades rejected the court's offer to reread an
instruction on the defendant's right not to testify and the
jury's obligation not to draw any inference of guilt from the
fact that he did not.

The Idaho Supreme Court concluded that context demon-
strated that the prosecutory's query ("What did we hear from
the defendant yesterday?") was accidental and did not pertain
to the defendant's failure to testify, but to the sufficiency of
the defendant's evidence. *Rhoades I* (Michelbacher), 822 P.2d
at 968. It also found that the prosecutor's other statements
about defense counsel's failure to explain the state's evidence
referred to evidence presented by the defense, not to the
defendant's failure to testify. *Id.*

The district court concluded there was no *Griffin* error[16] in the prosecutor's argument that certain evidence had not been explained or contradicted. And it agreed with the state trial court's finding that the prosecutor misspoke the one time he said "What did we hear from the defendant yesterday?" The district court noted that the jury had actually heard testimony from the defense on the precise point that the prosecutor was discussing, and the prosecutor could properly point out inconsistencies or weakness in that evidence. The court also thought it important that the prosecutor immediately changed his statement in front of the jury from "defendant" to "defense counsel," which was consistent with other statements throughout his closing argument. Finally, the court concluded that error, if any, was harmless given that the comment was not extensive; the prosecutor argued that Rhoades's evidence was not persuasive — not that the jury should infer guilt from his silence; and the state's case was quite strong.

**[13]** The Fifth Amendment prohibits a prosecutor from commenting on a defendant's decision not to testify. *Griffin*, 380 U.S. at 615. It is proper for the prosecutor to address the defense's arguments; comment is impermissible only "if it is manifestly intended to call attention to the defendant's failure to testify, or is of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify." *Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987). Comment is unacceptable, however, if the defendant is the sole person who could provide information on a particular issue. *Id.* at 810.

**[14]** Analyzing the prosecutor's statement in context, as *Boyde v. California*, 494 U.S. 370, 385 (1990), tells us we must, it is clear that the state court's determination is supported. The prosecutor corrected himself right away, properly

---

[16]*Griffin v. California*, 380 U.S. 609 (1965) (holding that the Fifth Amendment prohibits a prosecutor from asking a jury to infer a defendant's guilt based upon his decision not to testify).

substituting a reference to the defense counsel's case-in-chief that was consistent with the rest of his closing. As his next remarks also make clear, they were aimed at the weakness in a defense witness's actual testimony — not at Rhoades's failure to testify. In these circumstances, the jury would not "naturally and necessarily" take the statement to comment on the failure to testify. Nor could the jury have inferred something constitutionally insidious from the mere fact that Rhoades objected and the prosecutor corrected himself, as Rhoades suggests; the jury was plainly instructed that it was not to infer anything from the defendant's failure to testify. We presume the jury followed the court's instructions.

**[15]** *United States v. Sigal*, 572 F.2d 1320 (9th Cir. 1978), upon which Rhoades relies, concerns a very different scenario. There, the prosecutor told the jury "the defendants did not deny" they were in charge of a portion of the conspiracy, and it was only on appeal that the government argued he had meant to say "defense attorneys." *Id.* at 1322-23 & n.1. Although we thought the explanation was logical, it was also the case that the comment taken at face value, as we assumed the jury took it, constituted a comment on the failure of the defendants to testify. *Id.* at 1323. Here, the explanation is also logical and the comment was immediately corrected, so taken at face value it would not constitute a comment on the failure of Rhoades to testify. *See United States v. Adams*, 37 F.3d 383, 384 (8th Cir. 1994) (per curiam) (concluding there was no error where the prosecutor quickly corrected an inadvertent reference to the defendant, rather than defense counsel); *cf. United States v. Parker*, 549 F.2d 1217, 1221 (9th Cir. 1977) (holding that a comment about what the defendant, who showed the jury that he had a gold cap around a tooth, failed to state was harmless error because it "was not extensive, it did not stress any inference of guilt from [the defendant's] silence, and there was no substantial evidence that could have supported an acquittal").

Rhoades contends that other statements about evidence that the defense left unexplained were problematic as well, and

make it likely that the jury would have inferred intent to comment on silence when the prosecutor asked "What did we hear from the defendant yesterday?" For example, the prosecutor stated that "not one shred of evidence has been introduced by the defendant that these crimes did not occur," followed by: "We recognize the Court has instructed you that the defendant need not present witnesses, that he need not do anything in this case, the Court has instructed you in that respect." Rhoades suggests this was a subtle way to tell the jury to ignore the court's instructions, but we don't see how a statement reinforcing an instruction could reasonably be taken to mean the opposite.

**[16]** The prosecutor also stated: "What have they told you [about the gun]? They haven't told you anything. As was testified in the defense's case-in-chief they've had access to all of the evidence in this case. If there was evidence out there that would disassociate this gun from Paul Rhoades, we'd have heard it." Expert testimony matched the gun with at least one bullet in Michelbacher's body and matched shell casings recovered from where her body was found to test fires from the revolver found by the LTD. A natural reading of the prosecutor's comment is not that the defendant didn't testify, but that there was no meaningful challenge to the government's evidence.

Finally, the prosecutor stated:

> Where was the defendant? Everybody has got to be somewhere. If there was any explanation, let alone a rational explanation, of the defendant's whereabouts during the time this crime occurred, don't you think you would have heard it? There is none, and the reason there is none is because he was where those witnesses said he was. It's just that simple.

Rhoades argues that this statement comments on something only he knew with certainty, but this isn't necessarily so. Oth-

ers could have been with him, or could have seen him. As it happened, witnesses testified to having seen Rhoades at incriminating times and in incriminating places.

**[17]** Accordingly, we conclude there was no *Griffin* error.

DENIAL OF RELIEF ON CONVICTION AFFIRMED.